## FOLSOM VS. FOWLER, AD.

A complainant in chancery may, upon a rule for that purpose, obtain the testimony of one of the defendants in the cause, saving exceptions as to his interest, &c.

A party defendant, who disclaims all right to the property in controversy, and holds the legal title only as a trustee for the benefit of others, is a competent witness against his co-defendant—the possible liability for costs not disqualifying him in chancery, where it is discretionary with the Court to adjudge costs against him; but in such case the answer is not evidence against the co-defendant according to the principle decided in *Blakeney vs. Ferguson*, 14 *Ark.*

An arrangement between two judgment creditors and the debtor, that a slave belonging to the latter be sold under execution, and bought in by the attorney of one of the creditors, who should hold the legal title, but the slave should pass into the possession of the other creditor and remain on hire until the debts were satisfied, with leave to the debtor to redeem in a reasonable time: HELD, That the nature of the transaction was, that the slave be pledged or mortgaged, and that the creditor must account for the slave and all hires after satisfying his debt.

*Appeal from Jackson Circuit Court in Chancery.*

Hon. B. H. NEELY, Circuit Judge.

BEVENS and FAIRCHILD, for appellant,

FOWLER, contra.

HEMPSTEAD, Special Judge, delivered the opinion of the Court.

The deposition of William Byers, one of the defendants, was taken in behalf of the complainant, under an order of Court, subject to all just exceptions. A motion was made to suppress it, on two principal grounds: (1) that he was a party defendant to the suit; and (2) that he had an interest in the event of the suit. The motion was overruled, the deposition admitted to be read as evidence at the hearing, and Folsom excepted.

It is not only competent, but a very common practice to obtain the testimony of parties to the record in suits in chancery. The rule in that forum goes further than at law; for there a party to the record cannot be examined as a witness, unless it is by the aid of some statute to authorize it. *Dixon vs. Parker*, 2 *Ves. Senr.* 222. The usual course is to obtain an order for leave to examine a party to the record, and previous notice is not necessary. The order is grantable of course, "*saving just exceptions,*" which means on account of interest, or incompetency. 2 *Daniel's Ch. Pr.* 1044, 1045; *Plairville vs. Brown*, 4 *Hen. & Munf.* 402; *Neville vs. Demeritt*, 1 *Green. Ch. R.* 321.

The fact, that Byers was a party to the record, could not prevent the complainant from obtaining his testimony; and as the usual order was made for that purpose, the first ground of objection ought not to prevail. But next comes the more important question as to whether he was interested.

The tendency of modern decisions is to discourage and narrow exceptions to the competency of witnesses, and let objections go

36BB

to their credit. And this practice, well calculated, as it doubt-less is, to elicit the truth, and afford a fair view of the whole transaction, has in some States been extended so far by legisla-tion, as to make even interested witnesses competent. How far the experiment may prove successful, remains to be seen; and whether it does not offer too strong a temptation to perjury, may well admit of question.

With us, the principle of the common law prevails, that a per-son who is interested in the result of a cause, is incompetent. The interest must be real and direct, but the magnitude or degree of the interest is immaterial, because, be it ever so small, the effect is the same as if thousands were at stake. If the interest is di-rect, certain and vested, it amounts to a disqualification. 1 *Greenl. Ev.* 391, 386.

A direct and certain liability for costs in a suit, is sufficient to exclude a witness, and render him incompetent. But Byers can-not be said to stand in that category, because in chancery costs are discretionary, and it does not follow that the losing party must pay costs as at law. It is therefore not a certain and direct, but only a contingent liability, and not a sufficient interest to render the party incompetent as a witness, within the meaning of the rule of exclusion adverted to. 1 *Atk.* 451; 2 *Atk.* 228; 1 *Johns.* 556; 2 *Cowen* 186; *Daniel's Ch. Pr.* 1515, 1516; 6 *Johns. Ch. R.* 205; 1 *Johns.* 577.

Byers disclaimed all right to the slave in controversy, and only pretended to hold the naked legal title, as a trustee for the bene-fit of others. No decree was taken against him; none rendered in his favor; and his testimony was in fact against his own inter-est; because the effect of it was to divest the title out of himself. In all cases, a witness is competent to testify against his own in-terest. 1 *Greenleaf's Ev.* 410. We are unable to perceive any ground upon which he should have been excluded as incompe-tent; and entertain the opinion that his deposition was properly admitted.

According to the rule in *Blakeney vs. Ferguson,* 14 *Ark.* 642,

the answer of Byers could not be read against his co-defendant, (*Byers vs. Fowler*, 14 *Ark.* 105,) and the allowance of it was no doubt erroneous; but in chancery, the rule is well settled, that if there is sufficient evidence to sustain a decree, besides that which is incompetent, a party cannot be permitted to derive any bene·fit from that objection. Excluding the answer of Byers, still leaves sufficient competent evidence to maintain this decree.

The bill is founded on a claim, on the part of the complainant, to redeem the slave little Ben, or to account for him and his hire. It appears that Byers, as attorney for McKinney, had control of an execution against Stone, which was levied on the slave as the property of Stone. Folsom, the defendant, had an execution also, which was levied on the same slave, and was a junior incumberance. Stone was in embarrassed circumstances; and this was the only remaining property, out of which there was any prospect of realizing these debts, and they amounted to more than its value. Byers, Folsom, and Stone attended the sale; and the latter appears to have been averse to the sale of the property, without some right to redeem; and designed, as Byers learned and believed, to run off the negro, and thus defeat the collection of the McKinney and Folsom debts. To prevent that, Byers succeeded, after a good deal of difficulty, in effecting an arrangement, by which he was to bid off the slave under these executions, and hold the legal title; that the slave was to go into the possession of Folsom, and remain on hire until his debt was satisfied; and then that Stone, or any one of his family, might, in a reasonable time, redeem the slave by paying the amount of the McKinney debt. This was the substance of the arrangement; and it was verbal. It resulted from the fear, doubtless well founded, that, without it, the negro would be run off, or put out of the way; and indeed the conduct of Stone was such as not to commend him to the favorable consideration of a chancellor, or entitled him to the distinction of a law-abiding citizen; and were the facts less clear than they are, we should not hesitate to deny such a suitor any relief whatever.

Byers acted as the agent of Folsom; took control of his execution; bid off the negro at the sale; and took the title in his own name, so as to have the control of him; which was no unnecessary caution, seeing that he was a sort of a mediator between hostile parties. Byers paid nothing towards his bid, except the costs of the two executions, it being understood that he was not to do so, but receipted for the amount realized on the Folsom execution, as if it had been actually paid. There seems to have been a misunderstanding as to the extent and precise nature of the arrangement, as made on that occasion: Folsom claiming that the slave had been purchased for his benefit, and was to be his, on paying the McKinney debt; leaving in Stone and family only a right of redemption within twelve months.

But there is no proof that any such arrangement was made; and the circumstances show that the only one which existed, was that set up in the bill and proved expressly by the deposition of Byers. In support of this view, it is to be observed, that the McKinney debt was discharged by Stone, and not by Folsom at all; nor did the latter ever tender the amount of that debt, so as to make the contract which he sets up available, even supposing such a contract to have existed. It is true that Folsom in his answer denies the arrangement, respecting this negro, as alleged in the bill; but then it is established by one positive witness and corroborating circumstances, and that is sufficient to overturn the answer, (*Barraque vs. Siter*, 4 *Eng.* 550,) and warrant the relief sought by the bill.

The real nature of the transaction was, that this slave was pledged or mortgaged for the payment of these debts; and when they were discharged, the owner, Stone, had the right of redemption; because once a mortgage, always a mortgage. And Courts of Equity are inclined to construe contracts to be mortgages, rather than sales, whenever their real character may be doubtful. *Scott vs. Henry*, 13 *Ark.* 112.

Folsom has no reason to complain, because, by the arrangement, which was made, the means of discharging his debt was placed

in his own hands, and the debt actually discharged by the labor of the slave, and which, as shown by the evidence, was as valuable to him as money.

As Folsom failed to surrender the slave, he became responsible for his value, which, on sufficient testimony, was fixed at eleven hundred dollars; and also for hire, which was fixed by the Court at thirty six dollars and twenty-five cents a month, from the 8th day of January 1848, to the 19th of November 1851, amounting in the aggregate to one thousand six hundred and seventy-five dollars.

After giving the Folsom debt the credits admitted by him in his answer, the hire, up to the 8th of January 1848, extinguished the residue.

The value of the slave we do not consider as estimated too high. Nor can we say that the hire was put at an unreasonable rate, although we should have been satisfied with it, under all the circumstances, if it had been less. We do not feel warranted, however, in abating the amount of hire, or reversing the decree for excess; because the testimony of those best acquainted with the negro, fully sustains the finding of the Court. Indeed, some of them go beyond it. The negro seems to have been very likely and of good habits, and an engineer and blacksmith, and in fact the preponderance of proof is that such a negro was worth eleven hundred dollars, and his hire worth what it was fixed at by the Court. Affirmed.

WATKINS C. J., not sitting.