16  671
64  321

## PRYOR ET AL. VS. RYBURN.

Where one of several defendants in chancery is merely a nominal party, having no personal interest in the result of the suit—the bill seeking no decree against him—his deposition may be taken, upon an order of court for that purpose, in favor of the complainant. *Folsom vs. Fowler ad.*, 15 *Ark. Rep.* 281.

A complainant, prosecuting a suit in chancery as the next friend of an infant, is incompetent, as a witness, to sustain the allegations of the bill in behalf of the infant.

When the deposition of a party to the record is desired, an order of court for it to be taken will be made, as a matter of course, upon a suggestion that the party has no interest in the cause. And although such deposition, taken without such order, can not be read, yet an agreement of record, that all depositions, taken by either party, may be read upon the hearing, reserving objections to competency only, is a waiver of the objection that they were taken without an order of court.

The adverse possession of slaves for five years, gives the party in possession the right of property thereto by virtue of the act of 19th December, 1846, (*Digest, p.* 943,) and is "a complete bar to any suit in law or equity therefor," unless there be some showing to prevent the operation of the statute.

It is a general rule, that where the Legislature makes no exception in a statute of limitations, the courts can make none. *Erwin vs. Turner*, 1 *Eng. Rep.* 14; *State Bank vs. Morris et al.*, 13 *Ark. Rep.* 291.

A father conveys certain slaves to his son B., by bill of sale, expressing a money consideration : a few days afterwards, B. and his brothers and sisters execute an article of agreement, (reciting that B. had purchased the slaves of his father,) that the slaves are to remain in his possession until the death of the father, and then to be equally divided between them: On a bill for partition, more than five years after the death of the father, B. in his answer averred that the bill of sale was a *bona fide* conveyance; that he purchased the slaves of his father upon the consideration that he was to pay his father's debts; that the agreement was executed on the understanding that it was to be operative only in the event that the debts of the father did not exceed the value of the slaves; and that he had paid his father's debts to the full value of the slaves. The proof tended to sustain the answer: HELD, That the bill of sale was not a testamentary devise; nor was there such a case of trust established as would prevent the statute of limitation from running in favor of B.

The article of agreement was delivered to one of the parties to be benefited by it; its existence was unknown to another, who was a non-resident; and B. did not inform him of its execution: HELD, That it was not the duty of B. to do so, and his omission or failure was not such a fraud or concealment as would prevent the statute bar.

The heir cannot maintain a suit in equity for the value of personal property belonging to his ancestor, against a person who converts such property to his own use on the death of the ancestor—his remedy is only through an administration upon the estate of the deceased.

*Appeal from Hempstead Circuit Court in Chancery.*

The Hon. THOMAS HUBBARD, Circuit Judge.

WATKINS & GALLAGHER, and PIKE & CUMMINS, for the appellants. The deed of Matthew to B. F. Ryburn, was a testamentary instrument. *4 Dessau.* 617; 12 *N. Hamp.* 371; 4 *McCord* 198; 1 *Phil.* 1, *and cases cited;* 4 *McCord* 12; *West's case No.* 177, *p.* 314; 1 *Hagg.* 130; *ib.* 488; 1 *Russ.* 498; 3 *Keb.* 310; *S. C.* 1 *Mod.* 117; *Ves. J.* 204; *S. C.* 4 *Bro. C. C.* 335; 4 *Hawks.* 141; 2 *Hagg.* 554; *Walker* 520.

B. F. Ryburn was a direct trustee—to pay debts and distribute residue.

Any property may be the subject matter of a trust; and a trust of personalty, may be created or proven by parol. *Hill on Tr.* 44, 57, 58; 2 *Ala.* 156; *Ambl.* 264; 2 *S. W.* 393; 2 *J. & W.* 565, 573; *Hill on Tr.* 114, 119 *N. A.;* 2 *Kelly* 297; 4 *Sandf. Sup.* 102; 7 *Sm. & M.* 319.

Where parties act at all in respect to trust property, they will be deemed trustees, with like effect, as if they had executed the deed, and assented to act as such. *Hill T.* 215; 17 *Ves.* 488; 19 *Ves.* 638; 2 *Sch. & Lefr.* 231; *Hill T.* 215; 3 *McLean* 50.

In cases of express trusts, the statute of limitations, or the analogous bar in equity from the staleness of the demand, has no application. 14 *Ark.* 66; 2 *Eng.* 518; 3 *J. C. R.* 216; 7 *ib.* 90; 17 *Ves.* 97; 2 *Sch. & Lefr.* 633; 4 *M. & C.* 52; 2 *Keen* 722; *Hill on Tr.* 265; 3 *M. & Cr.* 31, 33; 7 *B. Mon.* 556; 3 *Kelly* 383; 1 *Maryland Ch. Dec.* 53.

The act of December 19th, 1846, (*Rev. St. chap.* 153, *p.* 943,) does not operate a bar unless there is adverse possession, which never can exist in cases of express trusts, as between trustee and *cestui que trust.*

The concealment of the facts, and the mistake under which the parties acted, would debar B. F. Ryburn from protecting himself by lapse of time. *Hill on Tr.* 148; 3 *S. W.* 300; 1 *Y. & C. Exch. Cas.* 238; 2 *Lead. Cases in Equity, part* 2d., *p.* 251, 255; 3 *Swanst.* 409; 4 *Russ.* 58; 3 *P. Wms.* 315, 321; 2 *Russ. & M.* 614; 2 *Ball & B.* 171; 2 *Beav.* 31, 56; 3 *P. Wms.* 315; *Cow. & Hill's Notes, p.* 1438, 1439, *and cases cited; Hill Tr.* 527.

Infancy and coverture will prevent the operation of the statute, whether trusts are express or implied, until the disability is removed. 3 *Brev.* 438; *Hill on Tr.* 265; 1 *Bro. C. C.* 9, &c., *ib.* 266; 3 *Myl. & Cr.* 81, 42; 4 *Geo.* 75; 3 *Swanst.* 64; *Cr. & Phil.* 135; *Hill on Tr.* 527, *and cases cited.*

S. H. HEMPSTEAD, contra. Points, &c. 1. That the property acquired by the appellee, from his father, was not sufficient to pay his debts.

2. That it belonged, and does now belong, to the appellee.

3. That it was not a testamentary disposition of property. *Digest* 987. Consideration may be proved by parol. 15 *Ark.* 278.

4. The paper signed by appellee, was without consideration and a *nude pact.* 1 *Chitty on Cont.* 29; 4 *Shepley* 458; 4 *John.* 235. There was no mutuality. 2 *Story's Eq.* 723, 790. Specific performance would not be decreed of it. 1 *Madd. R.* 1; 1 *Sch. & Lef.* 13; 2 *Story's Eq.* 742, 793 a.

5. Appellee did not become or act as a trustee.

6. Under act of 19th December, 1846, the title of appellee is good by five years possession. *Digest* 943; *Angell* 205; 17 *Vesey* 93; 1 *Eng.* 16, *and cases cited.*

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

On the 15th May, 1852, Richard H. Binford, his wife Susan J., formerly Ryburn, and Mary F. Ryburn, minor and sole heir of Montgomery M. Ryburn, deceased, by her next friend, the said Richard H. Binford, filed a bill on the chancery side of the Hempstead Circuit Court, against Benjamin F. Ryburn, John W. Ryburn, Edward L. Pryor, and wife Martha A., formerly Ryburn, alleging, in substance, as follows :

That, on the 1st February, 1843, Matthew Ryburn, (the father of the said Susan J. Binford, Montgomery M. Ryburn, Benjamin F. Ryburn, John W. Ryburn, and Martha A. Pryor,) residing in Lafayette county, by way of testamentary disposition of part of his estate, executed and delivered to said Benjamin F. Ryburn, an instrument in the form of a bill of sale, by which, for the nominal, but express consideration of $2500, he conveyed to him the following named slaves : George, a man aged 21 years ; Abraham, a boy aged 17 years ; Caroline, a girl aged 16 years; Leonard, a boy aged 12 years ; Jim, a boy aged 12 years ; Armstead, a boy aged about 8 years ; Warner Washington, a child of Maria, aged 7 months. Which bill of sale contained a clause of warranty, was executed in the presence of two attesting witnesses, acknowledged on the 17th March, 1844, and recorded in said county of Lafayette, 16th July, of the same year. A copy of the deed is exhibited.

That Matthew Ryburn died late in the year 1844, his children all surviving him.

That the said deed, or bill of sale, was made upon the understanding between Matthew Ryburn and Benjamin F. Ryburn, that the latter should, at the death of the former, divide the said negroes and their increase, equally, between himself and the said John W. Ryburn, Montgomery M. Ryburn, and Susan J. Binford, one-fourth to each. That no consideration whatever was paid by Benjamin F., nor passed between him and his father. That the sum of $2500, mentioned in the deed, was nominal and fictitious, and the deed was intended to be, and was in fact, merely a testamentary disposition of the slaves.

That accordingly, on the 18th February, 1843, John W. Ryburn being in the State of Tennessee, a deed, or article of agreement, was entered into and executed, by and between Benjamin F. Ryburn, Montgomery M. Ryburn, and Susan J. Binford, for themselves, and said John W. Ryburn, a copy of which is exhibited and is as follows:

"An article of agreement, made and entered into, on this the 18th day of February, A. D. 1843, between Benjamin F. Ryburn, of the first part, of the county of Lafayette and State of Arkansas, and Montgomery M. Ryburn and Susan J. Ryburn, of the State and county aforesaid, and John W. Ryburn of the county of Haywood, and State of Tennessee, of the second part, *witnesseth*: That whereas, the said B. F. Ryburn, of the first part, having, on the first day of February last, purchased of Matthew Ryburn, a family of negroes, namely : George, Abraham, Caroline, Leonard, Jim, Armstead, Maria and child—now the said negroes are to remain in the possession of the said party of the first part, until the death of the said Matthew Ryburn, at which time, they, the said negro slaves, are to be divided equally between the said parties of the first and second part.

In testimony whereof, we, the said parties of the first and second part (excepting John W. Ryburn, a party of the second part, who is absent in Tennessee,) have this day and date above written, set our hands and affixed our seals.

B. F. RYBURN,          [SEAL.]

M. M. RYBURN,          [SEAL.]

SUSAN J. RYBURN."      [SEAL.]

That Mathew Ryburn died seized and possessed of the following other negroes, &c.: Tom, man, then about 42 years old ; Amy, yellow woman, aged 27 years ; William, son of Amy, aged about 13 years ; Jane, daughter of Amy, aged about 9 years. Also, sundry mules, horses, a large number of cattle and hogs, a considerable quantity of house-hold and kitchen furniture, farming

implements, tools, wagons, harness, and divers other articles, &c., &c.

That upon the death of Matthew Ryburn, Benjamin F., not only remained and continued in possession of all the negroes named in the said deed, but also took possession of said other negroes, and of all the personal property above mentioned, and of the whole of said Matthew's estate, and converted the same to his own use. That he afterwards continued to manage, use and settle said estate as he pleased. He, nor any one else, administered thereon, nor did said Matthew leave any will.

That, at some time after the death of said Matthew, Benjamin F. delivered to John W. Ryburn, the slave Jim, and to Montgomery M. Ryburn, Abraham, Amy, and Jane. That Montgomery M. died in April, 1848, having, by will, devised Amy and Jane to his daughter, the complainant, Mary F., but that Benjamin F. administered on his estate, and claiming that he had merely loaned Amy and Jane to Montgomery M., and there being no one to oppose him, took them into his possession, and did not account for them as part of said estate. That Abram was sold by order of the Probate Court, as part of the estate of Montgomery M., in January, 1850, purchased by Benjamin F., who immediately sold him to one Bankhead, from whom the complainant, Richard H. Binford, purchased him in February, 1851, at the market price. He is alleged to be 26 years old, and worth $1000.

That John W. Ryburn still retained possession of Jim, who was 21 years old, and worth $800.

That Benjamin F. had appropriated to his own use, disposed of, or still retained, the horses, mules, cattle, and other personal property, mentioned above, and had, ever since the death of Matthew Ryburn, retained possession of, and used as his own, the slaves George, now (the time of filing the bill,) 29 years old, and worth $1000: Caroline, 25 years of age, and her children, four or five in number, born since the execution of the deed, names and ages unknown, worth, she and her children, $1900: Leon-

ard, 21 years, worth $1000: Tom, 50, worth $500: Amy 35, William, her son, 17; Jane 13; Martha 5, and Fanny 12 or 18 months, daughters of Amy—value not alleged.

That complainants, Richard H. Binford and Susan J., intermarried in February, 1849, and she is now 30 years old, and complainant, Mary F., is six years of age.

That, after the execution of the article of agreement above copied, it was left in the custody of Susan J., who afterwards mislaid it, and supposed it to be lost, until she accidentally found it, two or three months before filing the bill, when, for the first time, her husband Binford knew of its existence or contents, he having purchased Abraham in utter ignorance thereof, supposing the title good, and paying Bankhead for him $1100.

That, since the discovery of said article of agreement, Binford had applied to Benjamin F. for a division of the negroes, named in the deed and article, but he refused to make any, saying, he had paid debts of his father, Matthew, enough to cover all the property he had received; as to which, complainants knew nothing, nor did they believe it to be true.

The bill insists that Binford and wife are entitled to one-fourth, Mary F. one-fourth, John W. one-fourth, and Benjamin F. the remaining fourth of the negroes, George, Abraham, Caroline, and her four or five children: Leonard, Jim, Armstead, Maria and Warner Washington, the slaves, and their increase, named in the bill of sale, &c. And that Binford and wife are entitled to one-fifth: Mary F., John W. and Benjamin F., to one-fifth each, and Pryor and wife to the remaining fifth of the slaves, Tom, Amy, William, Jane, Martha and Fanny; and of the horses, mules, cattle, and other personal property, or an equivalent in money; and to like proportional parts of the hire, profits, &c., of the slaves from the death of Matthew Ryburn; and of interest or the equivalent of the personal property aforesaid.

That defendant, Benjamin F., had made no division of said slaves and other property, except to give Abraham to Montgomery, and Jim to John W. Ryburn, and refused to make any, but had retained the whole estate, without administration, &c.

The bill prays that Benjamin F. be compelled to discover the amount and description of property, choses in action, &c., left by Matthew Ryburn, that he account for the same, &c., and for partition of the slaves, and other property, or its value, interest, hire, &c., and that in making such partition, John W. Ryburn be charged with the value of Jim at the time he received him, with interest: Mary F. with the value of Abraham, and that Binford's title to him be quieted, and for general relief.

On the 5th October, 1852, Pryor and wife filed their answer and cross-bill. They claim no interest in the negroes conveyed by the deed from Matthew to Benjamin F. Ryburn. Admit all the allegations of the bill to be true, and join in the prayer, except as to the slaves named in the deed. By way of cross-bill, they allege that Matthew Ryburn died seized and possessed of the slaves, Tom, Amy and her children, William, Jane, Martha and Fanny, and of other personal property as alleged in the bill. That Benjamin F. Ryburn continued in possession thereof, and of the whole of said Matthew's estate, and has ever since had possession of the same; except that he loaned Amy and Jane for a time to Montgomery M., and Jane was now loaned to his daughter, Mary F. That no administration was had on said estate; but that Benjamin F. had kept all the property, still has all of said negroes, and has, or has disposed of, all of the personal property, which has not died, perished, or been worn out and destroyed.

That Benjamin F. has made no division of the estate, and particularly none to Pryor and wife. Prayer, for discovery, account, partition of the slaves, and other property, or its value, interest, hire, &c., and for general relief.

At the May term, 1853, Binford and wife dismissed the original bill, as to them.

At the same term, (20th May,) Benjamin F. Ryburn filed his answer to the cross-bill of Pryor and wife. He admits that Matthew Ryburn died, intestate, in Lafayette county, in the latter part of the year, 1844, surviving him, his children, John W., Martha A., Susan J., Montgomery M., and respondent; and that

Montgomery M. died intestate, in April, 1848, leaving Mary F. his only child. He positively denies that said Matthew died seized and possessed of the slaves, Tom, Amy, William, Jane, Martha and Fanny, or either of them, or of any other negroes; or of a large number of horses, mules, cattle, hogs, &c., &c., as charged in the bill. He avers the truth to be, that, about the 1st of February, 1843, said Matthew transferred and delivered to him, and he then purchased and acquired of the said Matthew, and became peaceably possessed of, the slaves Tom, Amy, William and Jane, and since then, Martha, and Fanny have been born. That from the time he so acquired said slaves, until the present, he has held peaceable possession thereof, as of his own property; exercising control and ownership, and claiming the same in his own right, and the issue of said negroes for more than ten years, without claim or interruption on the part of any one, until these vexatious and inequitable proceedings were set on foot, &c.

That the principal consideration for the purchase of said slaves was, that said Matthew was owing debts, which were then pressing upon him, many of which were liens and incumbrances upon the four slaves transferred as aforesaid, or the slaves were liable to be seized, sold and sacrificed towards the payment thereof, and upon several of which debts respondent was security for the said Matthew. That he took the property and assumed the payment of debts, to the full value thereof, all of which debts respondent has paid, and he proposes to furnish a schedule thereof, if required, &c. He alleges that he thereby acquired an absolute title to said slaves against all persons, paying the full value thereof, and therefore denies that said Matthew died seized or possessed of said slaves.

That the debts, which he had paid for said Matthew, exceed the value of all the property he ever received from him, which he did not pay for in money; and moreover, that in January, 1844, he purchased of said Mathew, a woman called Julia, and her child Maria, for which he paid him $750 in cash, and took a bill of sale, with warranty of title, which is exhibited. That Pryor had

brought trover against respondent for the value of said slaves and increase, and obtained judgment in the Hempstead Circuit Court, from which he had appealed to this court, where the case was pending, (*See Ryburn vs. Pryor*, 14 *Ark.* 505,) and if affirmed, the said Matthew would be liable to him, if living, and his property, if he left any, for the purchase money of said slaves, interest, &c., but which respondent would lose, on account of the insolvency of said Matthew.

That said Matthew, at the time of his death, had four cows, which came to the possession of respondent, worth $40, or $50. One horse, which respondent did not have possession of, and which died the same year; three or four beds and bedding, taken by Montgomery M. Ryburn, and with which respondent had nothing to do; but few, if any, farming implements of any value; and that his whole property was not worth over $150 : that he was really insolvent, and had no estate worth administration, which was well known to the complainants, &c.; who also knew that respondent had been, as it were, a father to his brothers and sisters, expending his means for their support and maintenance, and for the comfort and subsistence of the family, keeping them together in times past, and providing a home for those of them who chose to resort to it.

Admits that he had made no distribution of the estate of said Matthew, because he had none to distribute; denies that he converted property of said Mathew to his own use, or that complainants had any title to the slaves mentioned in the bill, as alleged.

Insists, that the pretended claim of complainants is stale, unjust and inequitable, and ought not to be entertained in equity. Pleads that his adverse possession of the slaves for more than five years under the statute of 19th December, 1844, gives him an absolute title thereto, against all persons, and that the relief sought by the complainants is barred, &c.

On the 21st of May, 1853, Pryor and wife filed an amendment and supplement to their cross-bill, for the benefit of themselves,

and such of the other heirs of Matthew Ryburn as thought proper to avail themselves of it. They allege that they intermarried many years before the death of said Matthew, had continued to live together as man and wife; and, since his death, Mrs. Pryor had been a *feme covert*. That the slave Tom is worth $1,000, Amy, $900; William, $1,000; Jane, $750; Martha, $400, and Fanny, $250. That the hire of Tom has been worth, since the death of said Matthew, $120 per annum; of Amy, $90 per annum; of William, from $36 to $100, according to his age; and of Jane, from and after the year 1848, $50 per annum. That since the filing of the cross-bill, Binford had made some final settlement with said Benjamin F. Ryburn, abandoned his suit, and no longer demanded anything from him. They pray that this suit may be taken and considered as brought by them, for themselves, and such of the other heirs as might choose to avail themselves of it, and that it proceed as an original suit, against said Benjamin F., and for such decree as by their bill is prayed, &c.

On the 13th of October, 1853, John W. Ryburn filed an answer and cross-bill. He admits the allegations in the bill to be true, and joins in the prayer thereof. By way of cross-bill, he alleges, that Matthew Ryburn died possessed of the slaves and other property mentioned in the bill; and that the defendant, Benjamin F., kept and converted the whole to his own use, &c. That from the time of the death of said Matthew, until December, 1848, complainant lived in Haywood county, Tennessee, when he removed to Jefferson county, in this State, where he has since resided. That he was never in that portion of the State, where said Matthew and Benjamin F. resided, until the first of the year 1849 ; and, until recently, had no knowledge of the condition in which the affairs of said Matthew had been left. That on hearing of his death, knowing that he had brought with him to Arkansas slaves and other property, worth at least $12.000, and owed but little at the time of his removal from Tennessee, complainant desiring to ascertain the condition of his estate, and get his portion thereof, wrote several letters to said Benjamin F., ask-

44B

ing for such information. To which he replied, in positive terms, that said Matthew had died utterly insolvent; that he had purchased of him all his slaves before his death, and paid more than the value of them in discharging his debts, &c. Relying upon the truth of these representations, and not supposing that said ˙Benjamin F. could wish to wrong his brothers and sisters, complainant gave himself no further concern about the matter, and made little or no inquiry as to how said Matthew became so suddenly embarrassed, &c. That, in the first of the year 1849, said Benjamin F. wrote to complainant, inviting him to visit him, proposing to pay his expenses going and returning, he being poor, and having to support a large family by his own labor. He accordingly paid him a visit, and while at his house, said Benjamin F. re-affirmed the substance of what he had before written him in relation to the condition of said Matthew's estate. That, in the latter part of the same year, he visited said Benjamin F. again; until when, he had not supposed that he had been using falsehood and misrepresentation towards complainant, in order to keep possession of, and acquire, if possible, by lapse of time, title to the slaves and other property left by said Matthew, &c. But complainant then made known to said Benjamin F. his suspicions, and claimed from him a division of the slaves, &c., mentioned in the original bill, &c.; but he again assured complainant that he had always represented the whole matter, touching said Matthew's estate truly and fairly; and exhibited to him a bundle of papers, which he said were notes, &c., paid for said Matthew by him, in his life time, amounting to more than the value of the slaves, &c. But complainant made no examination of the bundle of papers, telling said Benjamin F. that he could know nothing about them, and supposing that said Benjamin F. had paid the debts, as he had so frequently represented, &c. That Benjamin F. pretending to feel sympathy for complainant and family, on account of their indigence, proposed, from considerations of natural love and affection, to give to his wife, to be held in her own right, the negro boy Jim; and, accordingly, executed

to her a bill of sale for said boy, then worth about $500, and delivered him to complainant for his wife. He also made him a present of a horse worth from $60 to $100. That from thence until the filing of the original bill by Binford, &c., complainant remained in total ignorance of the fact that said Matthew made a testamentary disposal of his property, as stated in said bill, and which he learned, for the first time, in coming to answer the bill: nor did he, until then, have any knowledge of the execution or existence of the article of agreement exhibited with the bill— said Benjamin F. never having, in any of his letters to, or conversations with him, alluded to the agreement, or informed him of its existence. That, at the time he received from Benjamin F. the boy Jim and the horse, he gave him a receipt; and was induced by him to give it in such form as to show that he had received his interest or distributive share of the estate of said Matthew; but complainant avers that he did so under the impression that he had really no distributive share, and gave it in that form to gratify Benjamin F., and not because he supposed he was really receiving his share of said estate. But, since he has become possessed of the knowledge and information in relation to the slaves, &c., of said Matthew, above stated, he is satisfied that said Benjamin F. designed to perpetrate, and by falsehood and misrepresentation, did perpetrate a gross fraud upon him in obtaining said receipt from him. Had he supposed that such was his design, or that he was inducing complainant to give it for dishonest purposes, he would not have given it for anything other than the slave Jim and the horse at their real value. He is willing to be charged with the slave at $500, and the horse at $100, in the division of the slaves, &c., of said Matthew. Prayer for partition of the slaves, &c., &c., and for general relief, as prayed in the other bills.

On the 23d November, 1853, Benjamin F. Ryburn filed his answer to the amended and supplemental bill of Pryor and wife. He admits their marriage, and the coverture of Mrs. Pryor, as alleged. Protesting that they are not entitled to the discovery

sought or the relief prayed, and claiming the slaves to be absolutely his own property, he denies that the bill makes a correct estimate of their value and hire. On the contrary, he avers the truth to be as follows: Tom, aged 69 years, value $150, hire since the death of said Matthew, deducting cost of clothing, medical attention and taxes, $30 per annum. Amy, 40, and sickly, worth $500, hire $40. William, 22, $900, hire $50. Jane died September, 1853, at 13, worth then $700, hire $30. Martha, 5, $400, hire nothing. Fanny, 2, hire nothing, and raising equal to value. That if the slaves belonged to said Matthew, which he denies, respondent would be entitled to compensation for the care thereof, which would be worth nearly their hire. Avers again, his purchase of the slaves of said Matthew, his continued adverse possession of them from thence forward, relies upon the statute of limitations, and alleges that Pryor had rested under no disability to prevent him from asserting long before the pretended claim of his wife, &c.

On the 23d November, 1853, Benjamin F. Byburn also filed his answer to the original bill, and to the cross-bill of John W. Ryburn. Denies that said Matthew died seized and possessed of any of the slaves named in the bills, or that respondent held them for the benefit of him or his heirs. Denies that said Matthew died possessed of the other personal property, &c., as charged, but avers that he died insolvent, leaving nothing worth administration. That about the 1st of February, 1843, respondent absolutely purchased, and said Matthew transferred to him, by bill of sale and delivery, the slaves George, Abraham, Caroline, Leonard, Jim, Armstead, Mariah and child, Warner Washington: a copy of which bill of sale is exhibited with the original bill. That about the same time, respondent purchased, and said Matthew transferred and delivered to him, without bill of sale or writing, the slaves Tom, Mary, William and Jane: and that respondent thus acquired all of said slaves, without any resulting trust, or residuary right in the said Matthew, or any other person; and without any understanding or stipulation, as to any future dis-

position or division thereof; that the sale was absolute. That Martha and Fanny, children of Amy, have been born since, and Jane died in September, 1843. That the allegations in the bills, that said bill of sale was intended, or was in fact executed by said Matthew, by way of testamentary disposition of part of his estate; or that respondent received said negroes, or those for which no bill of sale was given, for any such purpose, or incumbered with any such condition or trust, were wholly untrue. And that the only possible pretext to demand a division of any of the slaves, must rest upon the separate agreement exhibited with the original bill, and copied above, which was no part of the contract of purchase, was executed for the reason and purpose stated below; was wholly without consideration and void, and extended only to the slaves therein named.

That the true considerations of the purchase of all of said slaves, was that said Matthew, then advanced in life, was owing the respondent for money advanced to, and paid for him; and was also owing debts to other persons, then pressing upon him, many of which had, by legal proceedings, become liens upon his negroes, or they were liable to be seized, sold, and sacrificed in payment thereof: upon some of which debts, the respondent was security for said Matthew, and had assumed the payment of others. That, from the embarrassed condition of said Mutthew, respondent could look for indemnity to the slave property only, he having none other of consequence. That slaves were then worth hardly more than half their present value, money scarce, and all the slaves transferred to respondent by the said Matthew, would not, under the hammer, have paid his debts, as it was believed. That respondent being security, &c., as above stated, and the creditors of said Matthew being willing to give respondent time to pay the debts, if he would assume them, and under the belief that he could save himself from loss thereby, he purchased all of said slaves, regarding it as the only means of saving himself from ultimate loss, and his aged father from absolute want, during the period he might live. That these were the true considerations of

the purchase of the slaves : and that the sum of $2500, expressed as the consideration in the bill of sale, was not actually paid to said Matthew at the time, but was inserted as approximating to the value of the slaves therein named.    But that the sale was absolute, &c., and respondent thereby acquired, and has ever since held all of said slaves as his own property, except Jim and Abraham.

That in compliance with his undertaking, respondent assumed, and has paid the debts of said Matthew, principal and interest, amounting to between $5,000 and $6,000, which, with the amount due from said Matthew to respondent, exceeds the value of all the slaves at the time of the purchase and transfer, &c.    That the payment of these debts was well known to the parties seeking relief—a schedule of which, with the amount due from said Matthew to respondent, he proposes to file, if required, and to prove the same, though from the death of witnesses, lapse of time, and loss of vouchers, he will be unable to establish the whole amount, &c.

He admits that about the 18th of February, 1853, after he had purchased said slaves, and entirely disconnected therewith, he signed the agreement exhibited with the original bill ; avers that it was executed by him voluntarily, without consideration, and totally disconnected with the purchase of the slaves.    That it was executed for the reason alone, that if the other slaves, or property, not therein embraced, were sufficient to pay off and discharge the debts due from said Matthew to respondent and others, the precise amount of which was not then known, those slaves were to be equally divided between respondent, said John W., Montgomery M., and Susan J., the said Martha A. having been provided for at her marriage ; but if the amounts of the debts reached the value of these slaves at the time, it was well understood and agreed among the parties, that no distribution could or ought to be made ; that the liability of respondent, in virtue of said paper, was to cease, and the agreement to become null and void ; for, otherwise, respondent would have been the only suf-

ferer.   That the reason and object of that paper were well known to the family, and respondent never concealed, or attempted to conceal, the same from the said John W., or any one else, and that the allegations in that respect are untrue—and respondent having no doubt that said John W., by means of correspondence or otherwise, knew of the existence of said paper, denies that he did not come to that knowledge until the time mentioned in his cross-bill.   That the agreement was executed upon the reason, and with the understanding above set forth, and no other; and when it was ascertained that the debts of said Matthew amounted to the value of all of his property, the agreement was known to the parties as no longer obligatory, if it ever was.   The respondent openly and notoriously claimed the said slaves as his own property, with their knowledge and consent, up to the institution of these proceedings : no division was asked for or demanded, and the agreement, no longer valid, was not brought forward, or any right asserted under it for nearly ten years, and then as a pretext to drive respondent into some compromise, or purchase of peace, &c.   He insists that the agreement was without consideration, was never acknowledged or recorded, that the reason for which it was made had failed, and that it should be declared null and void, &c.

Denies that the bill of sale was made upon an understanding between him and said Matthew, that he should divide the slaves conveyed, and their increase, on the death of said Matthew as alleged; or that the said agreement was executed in pursuance of any such understanding.

Avers that in addition to the debts paid by him for said Matthew, &c., &c., he purchased of him, 1st January, 1844, the woman Julia and her child, Maria, at $750 in cash, taking a bill of sale with warranty.   That Pryor had brought trover for the value of the woman and her children ; and, on 12th May, 1852, obtained judgment against respondent for $1,875, and costs.   That, by reason of the insolvency of said Matthew, he would lose the purchase money and interest, amounting to $1,100, besides costs, expenses and attorney's fees, amounting to $500.

Claiming the absolute title to said slaves, and denying that complainants are entitled to any partition of them, yet if the court should decree them to be part of the estate of said Matthew, respondent insists that, as such, they would be subject to the following claims before division could be made:

1. The amount of the debts, principal, interest, costs, and expenses paid by respondent for said Matthew.

2. The sum due from said Matthew to him for money paid, lent and advanced, &c.

3. The amount due on the warranty of Julia and child, with costs, expenses and counsel's fees, in defending the title to them.

4. Compensation for care and attention to the slaves from the time respondent acquired them to the present time, and reimbursement for taxes, clothing, medical bills, and other necessary expenses, &c.

5. Credit or reimbursement for property and money advanced to the said John W. and Montgomery M.

Which sums, respondent insists, exceed the value of all the slaves, and make it manifest that complainants are entitled to no relief, &c.

Denies that said Matthew died possessed of more than $150 worth of property: of which, but four cows, worth $40 or $50, came to respondent's possession, &c. That he died insolvent, leaving nothing worth administration, as complainants well knew, &c. That respondent had done a good part by said John W., Montgomery M. and Susan J., in giving them property beyond what they would be entitled to, on any division of said slaves, even if they had belonged to said Matthew, and in their maintenance and support, furnishing a home for the family, their mother having died before said Matthew, &c.

Admits that John W. resided in Tennessee, when said Matthew died, that he removed to Jefferson county, in 1848, and was not in respondent's neighborhood (Hempstead county,) until the time mentioned in his cross-bill. But avers that by means of correspondence and conferences with persons cognizant of the

matter, he was apprised of the situation of said Matthew at the time of his death—that he was insolvent—left no estate for distribution, and that respondent had purchased of him all his slaves, in order to reimburse and save himself, &c. That respondent stated these facts to said John W., in letters to, and conversations with him, and still avers them to be true.

That it is utterly false that respondent was guilty of the misrepresentation and·fraud imputed to him in said cross-bill, or that he used any concealment whatever in the premises, and that these and all kindred allegations, made by the said John W., are as unjust and false as they are ungrateful and scandalous, &c. That respondent willing to aid the said John W., as far as he was able, in justice to himself and family, let him have the boy Jim, now worth from $1,200 to $1,500, and made the title to his wife at his own request. Also, let him have a horse, worth $125, besides money. That on the 3d of December, 1849, said John W., with a knowledge of his rights, and of the condition of the estate of said Matthew, executed to respondent, the following receipt:

"Received of Benjamin F. Ryburn, six hundred dollars in full of all demands against him, this 3d of December, 1849.

JOHN W. RYBURN."

Which is the receipt referred to in the cross-bill. Denies that he concealed or misrepresented any thing, to induce said John W. to sign the receipt, or that he was not fully aware of his right, or that respondent perpetrated any fraud upon him to obtain it. Avers that it was given because said John W. felt that he had no claim against respondent for any cause whatever: and in giving the receipt, it was well understood that it included whatever right he might have in the estate of said Matthew, be the same more or less; and respondent pleads and insists upon it as a bar to the relief asked in the cross-bill.

Admits that he delivered the boy Abram or Abraham, to Montgomery M. in his life time : that he was sold under order of

the Probate Court, &c., for the payment of the debts of said Montgomery M., purchased by Bankhead, sold by him to Binford, and is now worth $1,000 or $1,500, &c.

Admits that he administered on the estate of said Montgomery M. and did not account for Amy and Jane, as part of his estate, because they did not belong to him, having been merely loaned to him by respondent.

That besides Abraham, respondent from time to time loaned to, and paid money for Montgomery M., to an amount above the the value of any distributive share he would have been entitled to in the said slaves, had they belonged to said Matthew at the time of his death, instead of respondent, a schedule of which he proposed to furnish if required. Denies that Mary F., child of Montgomery M., has any just claim upon respondent in respect of the estate of said Matthew.

States that since the filing of the original bill, Binford becoming satisfied from vouchers examined by him, and otherwise, that respondent had paid debts of said Matthew to an amount fully equal to the value of the property acquired by the respondent from him, dismissed the bill as to himself, and makes no further claim.

Insists that the claim set up in the bills, is stale, and barred by lapse of time. Pleads limitation of five years. Relies upon his peaceable, uninterrupted and adverse possession of the slaves, since the death of said Matthew for title, and pleads the statute of 19th December, 1846, as a bar to the relief sought.

On the 22d November, 1855, the cause came on to be heard upon the original and cross-bills, answers, replications, exhibits and depositions; and was dismissed for the want of equity, each party to pay his own costs. The complaining parties appealed to this court.

The evidence, so far as deemed material, will be stated in connection with the points at issue.

The bills proceed for a partition of the slaves, their hire, and of other personal property, or its value, with interest, &c.

Apart from the slaves, the answers of Benjamin F. Ryburn positively deny, that he received and used any personal property belonging to his father, at his death, except four cows, worth $40 or $50. There is nothing in the depositions read upon the hearing to overturn the truth of this portion of his answers. The only questions of magnitude in the cause, arise upon the claim of complainants to a partition of the slaves.

A preliminary question arises, as to the admissibility of the depositions of Binford and wife, and to determine this, their position, as parties to the suit, must be understood.

They were complainants in the original bill, claiming a partition of the slaves, &c., in right of Mrs. Binford. Binford was also complainant as the next friend of Mary F. Ryburn, demanding for her a share of the same property. They were made defendants in the cross-bills of Pryor and wife, and John W. Ryburn, but the slaves, &c., in controversy, being in the hands of Benjamin F. Ryburn, the cross-bills sought no relief as against Binford and wife. After Binford had compromised and settled the claim of himself and wife with Benjamin F. Ryburn, and dismissed the original bill as to them, he continued to be a complainant as the next friend of Mary F. Ryburn, and the bill was prosecuted for her benefit.

Binford and wife, after the compromise, had no personal interest in the result of the suit, as they state in their depositions, and the cross-bills seeking no decree against them, they were merely nominal defendants thereto, and in this attitude, though parties, their depositions might have been taken upon an order of court for that purpose, in favor of the complainants in the cross-bills, even if they had been contingently liable for costs. *Folsom vs. Fowler adm.*, 15 *Ark. Rep.* 281; 1 *Greenlf. Ev.*, sec. 361; 2 *Daniel's Chancery Plead. & Prac.* 1035 to 1044, *and notes; Gresley's Eq. Ev.* 338.

But Binford being complainant in the original bill, as the next friend of Mary F. Ryburn, it seems that his deposition could not be taken to sustain the allegations of the bill in her behalf. In

other words, he could not be a witness in his own case, though prosecuting as a *prochien amy*. 2 *Daniel's Chancery Plead. & Prac.* 1037, 1038; *Gresley's Eq. Ev.* 357, 359; *Eckford vs. De Kay et al.*, 6 *Paige Chan. Rep.* 565.

To the extent that Binford would be incompetent, his wife also would be disqualified. 1 *Greenlf. Ev.*, sec. 334, *et seq.*

The cross-bills seeking the same relief against Benjamin F. Ryburn, which is sought by the original bill—a partition of the slaves, &c., among the parties—the depositions of Binford and wife could not be read in favor of the complainants in the cross-bills, without enuring to the benefit of the infant complainant in the original bill, represented by Binford; and hence, their depositions must be disregarded altogether. *Eckford vs. DeKay*, 6 *Paige Chan. Rep.* 565.

It is insisted, also, that the depositions of Binford and wife should be excluded, because they were taken without an order of court. Where the deposition of a party to the record is desired, an order of court for it to be taken, will be made, as a matter of course, upon a suggestion that the party has no interest in the cause, the court leaving the question of interest to be settled at the hearing. *Folsom vs. Fowler adm.*, 15 *Ark. Rep.* 280; *Neville vs. Demeritt et al.*, 1 *Green's Chan. Rep.* 33; 2 *Daniel's Chan. Plead. & Practice* 1044; *Gresley's Eq. Ev.* 338; 1 *Greenl. Ev.*, sec. 361. And it has been held that the deposition of a party, taken without such order, cannot be read. *Clagett et al. vs. R. & H. M. Hall*, 9 *Gill & John. Rep.* 96; *De Wolf vs. Johnson*, 10 *Wheat.* 367; *Bogart vs. Bogart*, 2 *Edward's Chan. Rep.* 399. But see *Sproule et al. vs. Samuel et al.*, 4 *Scam.* 137.

But the counsel in the cause, in the court below, filed an agreement of record that all the depositions, taken by either party, might be read upon the hearing, reserving objections to competency only. This agreement waived the objection that the depositions of Binford and wife were taken without an order of court.

Returning to the main issue, it is manifest, from the pleadings

and evidence, that Benjamin F. Ryburn was in possession of the slaves in controversy from the death of his father, Matthew Ryburn, in the latter part of the year 1844, until the commencement of this suit, in May, 1852, using and claiming them as his own property. During this entire period, it does not appear that he made any clear and distinct admission of any claim of the complainants to a partition of the slaves. It is true, that he let John W. Ryburn have the boy Jim, and Montgomery M. Ryburn the boy Abraham, but the bills do not allege, nor does the proof show that he delivered these slaves to them upon a recognition of their right to a partition, but he seems to have placed it upon the ground of a gratuitous assistance of his brothers, claiming that he had purchased all the slaves of his father, and paid their full value. Whatever may have been his actual motives for letting them have those slaves, the testimony fails to show any clear and open admission by him of a right in them: such as would be necessary to avoid the conclusion that he held adverse possession of all the slaves from the death of his father forward.

It is also manifest, that whatever right of action for partition, Pryor and wife, John W. Ryburn, and Montgomery M., the father of Mary F. Ryburn, may have had of the slaves mentioned in the article of agreement of the 18th February, 1843, or of the other slaves, accrued to them upon the death of Matthew Ryburn, according to the allegations of the bills.

It follows, that the adverse possession of the slaves by Benjamin F. Ryburn, for more than five years after the passage of the act of 19th December, 1846, (*Digest, p.* 943,) and before the institution of this suit, gave him the right of property thereto by virtue of the statute, and was "a complete bar to any suit in law or equity therefor," unless something appears of record to prevent the operation of the statute as against the complainants.

The only exception upon the face of the statute, is contained in the 5th section, and applies to cases of possession of slaves held under a deed, or other instrument of writing from the owner, duly acknowledged and recorded in the county where the slaves are possessed. This exception has no application in this case.

It appears, that at the time of the death of Matthew Ryburn, Mrs. Pryor was a married woman, and so continued; and that John W. Ryburn resided in the State of Tennessee; and continued to reside there until December, 1848, when he removed to and settled in Arkansas. Montgomery M. Ryburn survived his father until April, 1848, when he died, leaving the infant complainant, Mary F. his sole representative.

The act, in its terms, applies to suits in equity as well as at law, and makes no exceptions in favor of any class of persons.

The general rule, that where the Legislature makes no exceptions in favor of infants, married women, non-residents, &c., the courts can make none, was recognized in *Erwin vs. Turner*, 1 *Eng. Rep.* 14. And in *State Bank vs. Morris et al.*, 13 *Ark. Rep.* 291, this court said: "The statute which creates the limitation, must also create the exception: we know of no rule of law or decision to the contrary." If it were deemed necessary to look beyond these decisions, there is no want of authorities to to sustain them. *Angel on Lim.* 204, 205; *Beckford et al. vs. Wade*, 17 *Vesey* 87, *and cases cited; Hall vs. Barnstead*, 20 *Pick. Rep.* 2; *Sacia vs. DeGraaf*, 1 *Cowen* 356; *Clark vs. Rutherford*, 3 *Murphy Rep.* 237.

There were, doubtless, grave considerations of policy, which induced the Legislature to pass the act in question, without the exceptions usually made in general statutes of limitation. Ours was, at the date of the enactment, as it still is, comparatively a new State, increasing its population by immigration mostly from the slave States. Slaves were being brought into our State for settlement or market, from abroad, and changing owners among our own people. Unlike land, they are a moveable property. Cases doubtless had arisen, and were likely to arise, in which persons purchasing slaves in good faith, had, or might have, to surrender them with an account of hire, after the lapse of many years, in favor of the dormant claims of non-residents, married women, infants, &c. Hard cases may arise under the statute, but more numerous cases of hardship might have arisen had the

statute been less comprehensive in its terms. All this, however, was the subject of legislative policy.

Before the passage of this act, the Legislature had repealed the reservation contained in the general statute of limitations in favor of non-residents, except in cases of fraudulently absconding debtors, &c. *Digest, chap.* 99, *secs.* 14, 15.

Husbands have sufficient motives to look after the property, and protect the interest of their wives, and Pryor and wife could as well have commenced their action in this case, upon the death of Matthew Ryburn, as at a later period. Our statute makes ample provision for the appointment of guardians for infants, whose duty it is to take care of their estates, and prosecute their claims to property. All such considerations were doubtless weighed by the Legislature in passing the act in question.

It is insisted, moreover, by the counsel of complainants, that Benjamin F. Ryburn held the slaves as a trustee, and that the statute would not run in his favor. The bills do not make any case of trust against him, as to the slaves not included in the bill of sale, and in the article of agreement. They allege that Matthew Ryburn died the owner of these slaves, and that after his death, Benjamin F. Ryburn kept and converted them to his own use.

As to the other slaves, the bills allege that the bill of sale, though in the form of a deed, was a testamentary devise, made by Matthew to Benjamin F. Ryburn, without consideration, upon an understanding that the slaves, upon the death of Matthew, were to be divided by Benjamin F., between himself, John W., Montgomery M. and Susan, and that in pursuance of this arrangement the article of agreement was executed.

Benjamin F. denies that the bill of sale was intended as a testamentary disposition of the slaves, made upon any such understanding. He avers that the bill of sale was intended to be, what it imports to be upon its face, an absolute conveyance. That he purchased the slaves therein mentioned, as well as the other slaves of his father, upon the consideration that he was to dis-

charge his liabilities, &c. That the instrument of February the 18th, 1843, was a voluntary and independent agreement, made upon the understanding that if the debts, &c., of his father, did not exceed the value of the slaves not embraced in the article, it was to be operative, otherwise it was to be null and void; and that the liabilities &c., of his father amounted to the full value of all the slaves, &c.

The depositions in the cause, tend rather to sustain, than to overturn his version of the contracts.

Dr. *Ellets* testified, that he drew the bill of sale at the request of Matthew Ryburn. That the consideration upon which the negroes were sold to Benjamin F., was that he was to pay off all the liabilities at that time existing against his father in the State of Arkansas, to support him during his life, and pay him a certain sum of money. That Matthew Ryburn told the witness at the time, that he was in debt, and wished his debts paid by his son Benjamin F. He had been in bad health for more than a year, and by reason of ill health and old age, was too feeble to attend much to business. His mind was deemed sound. At the time the bill of sale was executed, Benjamin F. paid his father money, but the witness did not know the amount. It was in a shot-bag, and was handed to Matthew by Benjamin F., as a part of the consideration of the slaves. Matthew told the witness it had been counted to him or by him. It was gold and silver, and the shot-bag, which was of the ordinary size, was about half full. Benjamin F., afterwards paid to witness a medical bill which Matthew owed him.

The witness further states, that the agreement of 18th February, 1843, was taken because Matthew Ryburn had concluded that the property sold to Benjamin F. was worth more than the amount that he was owing, and what would be necessary for his support, and that of his younger children, Montgomery and Susan. That Benjamin F. Ryburn at first refused to sign the writing, because he said he had already assumed for his father more than the property was worth. Witness had written the bill of sale,

and also wrote the agreement. He regarded the latter instrument in the light of a private memorandum for the parties, and he induced Benjamin F. to sign it, to satisfy the old man, and at the same time represented to him that this could not affect the bill of sale. But for the influence of the witness, and his assurance that the latter agreement could not affect the bill of sale, Benjamin F. would not have signed the agreement. The value of the slaves, named in the bill of sale, at the time, was not less than $2500, nor more than $2750.

*Janes* testified, that he held a note against Matthew Ryburn, upon which he had paid a small amount, and when he called upon him for the balance, Matthew told him that he had sold out to his son Benjamin F., and that he was to pay all his debts. After the death of Matthew, Benjamin F. paid the debt.

*McKinney* testified, that he called on Matthew Ryburn for the payment of a note which he held against him, and the old man referred him to his son Benjamin F., stating that he found himself inthralled, and did not think he could ever be able to pay his debts; that he wished all his just debts paid, and that to do this, he had turned over to Benjamin F. all his property, on the understanding that he was to pay off his debts. Witness then went to Benjamin F. and he paid the debt.

Other depositions in the cause show the payment of a number of the debts of Matthew Ryburn by Benjamin F. amounting to a considerable sum; but we deem it unnecessary to make an estimate of the entire amount. The proof of the payment of these debts, by Benjamin F., conduces to sustain the statement in his answers, that he purchased the slaves of his father.

We think the complainants have failed to establish any such trust as would prevent the statute of limitations from running in favor of Benjamin F. Ryburn. See *Sullivan vs. Hadley et al., ante.*

It is alleged by John W. Ryburn, that Benjamin F. Ryburn committed a fraud upon him, in concealing from him the existence of the article of agreement; and, therefore, the statute would not run against him. Without intending now to decide

45B

whether any fraud and concealment, or, if any, what would prevent the running of the statute in question, it may be remarked that the allegations of fraud and concealment, made by the cross-bill of John W., and denied by the answer of Benjamin F., are not sustained by proof. The article of agreement when executed, was delivered to Susan J. Ryburn, and but little consequence seems to have been attached to it, by the parties, for a number of years afterwards. We do not know that it was particularly incumbent on Benjamin F. Ryburn to make its existence known to John W., or that his failure to do so, under all the circumstances, could be regarded as a fraud.

Upon all the facts of the case, we think the remedy of the complainants, for a partition of the slaves, was barred.

Nothing remains to be considered but the right of complainants to a decree for partition of the four cows, or their value, which Benjamin F. Ryburn admits came to his hands upon the death of his father, and which he converted to his own use, without any pretence of purchase.

Upon the death of Matthew Ryburn, this species of property did not technically descend to his heirs, like lands or slaves, and we think the safer doctrine is, that complainants could only make Benjamin F. liable for this property, and obtain distribution of it through an administration. See *Lemon's heirs vs. Rector et al*, 14 *Ark. R.* 436.

The decree of the court below is affirmed.