## FREDERICK M. ZEIGLER

*v.*

## GEORGE R. H. HUGHES.

1. ATTORNEY AND CLIENT—*when the relation ceases—in the matter of collecting a debt.* It has been held that an attorney's duty does not cease upon the recovery of a judgment on a claim put in his hands for collection, but that it continues until the expiration of the time of redemption from the sale, where land has been sold towards the satisfaction of the judgment.

2. So where an attorney was employed to foreclose a mortgage, and to do all acts necessary to be done, in and out of court, for the sale of the mortgaged property, and was to receive out of the proceeds of such sale a certain portion thereof for his services, it was *held*, a judgment of foreclosure having been obtained, and a sale had, the premises being bid off in the name of the creditor, and a purchase by the attorney from him within a year after the sale, the relation of attorney and client continued to exist, so as to subject the former to the rule which regulates the dealings between them.

3. In such a case it appeared the attorney purchased the property from his client, during the time that relation existed between them in respect to the same, at a price much below its value, the client having no knowledge of the value except from representations of his attorney, in making which the latter failed to exercise that degree of good faith demanded by the confidential relation he held. So upon bill filed by the client it was *held*, the attorney should be regarded as holding the proceeds of the property, which he had sold, as a trustee for his client, and should account therefor accordingly.

4. SAME—*of. the good faith required of the attorney, in dealing with his client—burden of proof.* In order to sustain a purchase of property by an attorney from his client during the existence of that relation in respect to the subject matter of the contract, where the transaction is afterwards questioned by the client the burden rests upon the attorney of establishing its perfect fairness, adequacy and equity.

5. SAME—*where the attorney negotiates with his client through a third person.* An attorney will not be relieved from the obligations imposed upon him by reason of his confidential relation, in dealing with his client in reference to property involved in that relation, merely from the fact that the negotiation between them is carried on through a third person, the latter being interested at the time with the attorney in the transaction.

6. MAINTENANCE. The fact that a third person has assumed to defray the expenses of a suit, will not operate to destroy the equities of the party in whose name the relief is sought, as they may appear in the case.

7. LACHES—*in what manner availed of.* Where a defendant in chancery desires to avail of any *laches* on the part of the complainant in asserting his remedy, he should set it up in his answer, so as to give the complainant an opportunity to amend his bill, by inserting allegations accounting for the delay.

8. MORTGAGE—*defective acknowledgment.* A defective acknowledgment of a mortgage will not operate to impair the validity of the instrument, nor will a reversal of a judgment of foreclosure for that cause at all affect the lien of the mortgage.

APPEAL from the Circuit Court of Cook county; the Hon. ERASTUS S. WILLIAMS, Judge, presiding.

The opinion states the case.

Mr. B. D. MAGRUDER, for the appellant.

The relation of attorney and client does not cease, where the former is employed to foreclose a mortgage, until the expiration of the time of redemption, in case a sale is had under the foreclosure. *Smith* v. *Harvey,* 31 Ill. 62; *Watkins* v. *McLean,* 43 Ill. 24.

As to the degree of good faith and fairness required of an attorney or an agent, in dealing with his client or principal, see *Fox* v. *McRcth,* 1 Lead. Cas. in Eq. 138; 1 Story Eq. Jur. secs. 310, 313; *Pensonneau* v. *Bleakly,* 14 Ill. 15; *Casey* v. *Casey,*

ib. 112; *Jennings* v. *McConnel,* 17 Ill. 148; *McDonald* v. *Fithian,* 1 Gilm. 269; *Phelps* v. *Reeder,* 39 Ill. 172; *Moore* v. *Bracken,* 27 Ill. 26; *Dennis* v. *McCagg,* 32 Ill. 429; *Robbins* v. *Butler,* 24 Ill. 387.

Mr. GEORGE F. BAILEY, also for the appellant.

Messrs. GOOKINS & ROBERTS, for the appellee.

The rule is, " If a solicitor deal with his client he must prove that the client had due professional advice and assistance for the purpose of explaining the matter to him." *Barnard* v. *Hunter,* 39 Eng. Law & Eq. 569. When this is shown, we insist the parties will be regarded as having dealt at "arm's length." See notes to Story's Eq. Jur. secs. 310, 311; *Casey* v. *Casey,* 14 Ill. 112; *Jennings* v. *McConnel,* 17 Ill. 148.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

In July, 1845, Brantz Mayer and wife, of Baltimore, Md., executed to the complainant, Zeigler, of the same place, a mortgage upon the undivided half of a lot of ground in the north division of Chicago, fronting 100 feet on Ontario street, and running back 109 feet on Cass street, to secure $5860, to be paid November 1, 1845. The mortgage was not legally acknowledged or proved, the combined proof and acknowledgment containing no identification of the grantors, but it was recorded. March 28, 1861, Zeigler gave to the appellee, Hughes, an attorney at law in Chicago, the following power of attorney and · agreement in writing:

" I do hereby authorize George R. H. Hughes to prosecute my claim against Brantz Mayer, of Baltimore, and especially to foreclose the mortgage held by me on a lot of ground on Cass street, in Chicago, and do all acts necessary to be done, in and out of court, for the sale of said property so mortgaged; and I hereby promise and bind myself to allow said Hughes, out of the proceeds of said sale, after deducting necessary court

expenses and costs, twenty-five per cent commission for his services and trouble, on the net sales."

August 21, 1861, Hughes, as Zeigler's attorney, commenced a proceeding to foreclose said mortgage, by *scire facias*, in the superior court of Chicago, and at the October term, 1861, obtained a judgment by default on the return of two *nihils*, against Mayer and wife, for $7725.35.

May 23, 1862, the property was sold by the sheriff, under the execution issued upon this judgment, for $6000, that amount having been bid by Hughes for Zeigler. The certificate of purchase was issued in Zeigler's name, and delivered to Hughes, the time of redemption for Mayer expiring May 23, 1863, and for his creditors, August 23, 1863.

In January, 1863, Hughes went to Baltimore. Before leaving for Baltimore, an order was entered in the foreclosure suit, January 15, 1863, directing the sheriff to amend his return on the execution, the record reciting that the order was made on the motion and affidavit of Hughes, as Zeigler's attorney.

January 31, 1863, in Baltimore, Zeigler, upon the application, and at the request of Hughes, executed an assignment of the whole of his judgment against Mayer, and also of the certificate of purchase, and of the mortgage and the indebtedness secured by it, to one Sanderson Robert, of Cincinnati, upon these terms: $700 paid in cash January 31, 1863; $800 to be paid September 1, 1863, or sooner, at the option of the grantee, upon condition, however, that if Mayer should appeal from the judgment, or the same should be declared void, the payment of the $800 should be deferred until the title should become confirmed in Robert.

Before this purchase, A. W. Arrington, a lawyer of eminence in Chicago, had advised, that in consequence of the defect in the acknowledgment of the mortgage, the judgment was subject to reversal on error, and that, to avoid the effect upon the title, of such reversal, the property be conveyed to a third person.

The negotiation for the purchase from Zeigler was carried on wholly through Mr. Glocker, Zeigler's attorney in Baltimore, they both being Germans, speaking the German language.

The $800, less twenty-five dollars for an abstract, was paid August 21, 1863. The certificate of purchase was delivered up by Zeigler September 1, 1863. September 4, 1863, in Chicago, Robert executed and delivered to Hughes a declaration of trust, stating that he held the judgment, the certificate and the title by sheriff's deed to be executed, in trust for Hughes, and would convey to Hughes whenever requested.

September 5, 1863, the sheriff executed a deed to Robert, as assignee of the certificate. November 18, 1863, Zeigler executed a quit claim deed to Robert, at Hughes' request, in order to strengthen the title already in Robert by the assignment of the certificate and the sheriff's deed.

January 5, 1864, Robert died suddenly, the legal title being in him. By a chancery proceeding, begun July 4, 1864, resulting in a decree, October 14, 1864, vesting the title in Hughes, and a master's deed to Hughes, dated October 19, 1864, and also by deeds from the heirs of Robert, executed in August, 1864, and October, 1865, the legal title which was in Robert at the time of his death, became vested in Hughes. In March, 1864, Zeigler, at Hughes' request, executed a release to Mayer of the balance of the judgment, over and above $6000. Robert's administrator also executed a release of said balance. By delivering up these releases to Mayer, one Brown, of Baltimore, induced Mayer to execute a quit claim deed, dated May 30, 1864, of said property to him, Brown. June 2, 1864, Brown executed a quit claim to Hughes. Thus Hughes became the owner of the mortgagor's interest in the property. October 21, 1865, Griswold, the owner of the other half of the lot, and Hughes, divided. Hughes took the east forty feet, Griswold the west sixty feet. Griswold paid Hughes $1250 in cash for the excess of the sixty feet in value over the forty feet. Between June, 1864, and October 21, 1865, Hughes

collected from the property, rents to the amount of $127.37. January 11, 1866, Hughes sold the east forty feet to Stark for $7500 in cash.

The bill in this case was filed September 22, 1868. The matters complained of are, that Hughes bid in the property against the wishes of Zeigler, who wanted it sold for what it would bring; that he did not try to make the sale known to the public, but kept it quiet for his own purposes, when, by proper efforts, it would have brought $5000 or $6000; that in January, 1863, he represented to Zeigler that Robert would give him $1300, then $1500, for his interest in the certificate and claim, and that this was its full value, and it would be a good sale; that Robert was in poor health, and urged an acceptance of the offer without delay; that he understood the value of the property, and exaggerated the defects in the title fraudulently and to get the land for himself; that it was at that time worth $125 per foot; that he fraudulently represented that Robert was the purchaser, when he was himself the purchaser; that he, by that means, bought the property for less than half its value; that November 18, 1863, he, at Hughes' request, executed to Robert a quit claim deed of the property, which was sent to Hughes for Robert; that he executed to Mayer a release of the balance of the debt, at the instance of Hughes, and to enable the heirs of Robert to assert their rights to the property; that Hughes procured the release from him in order to get a quit claim deed of the property from Mayer, which was accomplished by Brown, a brother-in-law of Robert, obtaining the deed to himself, June 7, 1864, who afterwards conveyed to Hughes. The bill prays for an account against Hughes, and that he should pay over what he has realized from the lot.

The answer denies the fraud charged in the bill, and the facts on which the charge is based; alleges that the claim against Mayer was worthless, being barred by the statute of limitations, and that Mayer was insolvent; that the judgment of foreclosure was reversible on error, by reason of a defective

certificate of acknowledgment; that owing to the character of the claim, Zeigler would only give a contingent fee; that Glocker, of Baltimore, Zeigler's attorney, had twice visited Chicago, and become well acquainted with the value of the property; that in his correspondence with Glocker, he gave him his best information concerning it, and informed him that in 1859, a friend had valued it at $175 per foot. He sets forth in his answer, the particulars of the negotiation between himself and Zeigler, all of which was carried on through Glocker; some of the leading facts of which are, that his interest of $12\frac{1}{2}$ feet was undesirable, as it could not be improved to advantage, or sold, and it was necessary for him to buy or sell to make it available; that in July, 1862, Zeigler, through Glocker, offered one-fourth to Hughes for $800, which he declined, and again in October, he offered one-fourth at $500; that he once got an offer from Robert of $1100, for one-half, which the latter afterwards withdrew, in consequence of the defects in the title; that he forwarded A. W. Arrington's opinion to Glocker in December, 1862; that after Robert declined it, Hughes made, through Glocker, the offer of $1500; Glocker replied that Zeigler would take that amount, as he was pressed by the heirs of John W. Zeigler, but stating, the property was worth $10,000 to $12,000; that he had never seen Zeigler, and all his communications had been through Glocker; that Zeigler well knew that he, Hughes, was the purchaser; the defects in the title, and that Mayer had agents in Chicago, and that he, Hughes, was taking all the risk in buying it; that his services as attorney were ended before he made the purchase; that although, in his correspondence with Glocker, after January 31, 1863, Robert was named as the purchaser, it was well known why Robert's name was used, etc. The answer sets up the statute of limitations, that the cause of action did not accrue within five years next before the commencement of the suit.

It has been decided by this court, that an attorney's duty does not cease upon the recovery of a judgment on a claim put in his hands for collection, but that it continues until the

expiration of the time of redemption from the sale, where land has been sold towards the satisfaction of the judgment. *Smith* v. *Harvey*, 31 Ill. 62; *Watkins* v. *McLean*, ib. 24.

We think, then, especially under the terms of the retainer in this case, that the confidential relation of client and attorney, between Zeigler and Hughes, had not terminated when the purchase from Zeigler was made, and that its character is to be judged of under the rule which regulates the dealings between client and attorney during the existence of such relation.

In order to sustain such a purchase, that rule imposes upon the attorney the burden of establishing its perfect fairness, adequacy and equity. 1 Story Eq. Ju. sec. 311; *Edwards* v. *Meyrick*, 2 Hare R. 60; *Howell* v. *Ransom*, 11 Paige, 538.

The price paid to Zeigler for his three-fourths interest in the lot, and the balance of the mortgage debt, was $1500, at the rate of forty dollars per foot of fifty feet. Eight witnesses, residing near the property, a majority of them real estate dealers, fixed the value of the lot, in the winter of 1862–3, at $125 per foot. Seven others valued it much less, two of them as low as sixty dollars per foot.

Ogden, who had the agency of the property for Mayer, was offered $160 per foot for the lot in the winter of 1862–3, or spring of 1863, and in 1864, he was offered $150 per foot for it, refusing both offers, because $200 per foot was asked.

Hughes, after having received $1250 for the difference in the division of the lot, between forty and sixty feet, sold the forty feet, January 11, 1866, for $7500 cash, making, with $127 rent received, $8877 as the amount realized by him for the lot, and deducting one-fourth, his interest, as a fee, in the lot, leaves $6658 as the amount of money which he actually realized by January 11, 1866, on the purchase from Zeigler, January 31, 1863, for $1500.

We do not perceive that this difference in price is due to the increase in the value of the property during the intermediate time.

The only testimony on that particular point, that we have observed, is that of Higginson, a real estate broker, who testified that he estimated the value of the property in the winter of 1862–3 at $125 per foot, and in 1866 at $175 per foot.

It is true, the valuation of the witnesses must have been in view of a good title to the lot, and that the title here was imperfect. But although the judgment was liable to be reversed on error, on account of the defective acknowledgment of the mortgage, such reversal would not destroy the validity of the mortgage. It would still remain a lien upon the land, to secure the payment of the mortgage debt.

The bar of the statute of limitations, as is claimed, does not appear to have arisen against the debt, although the time limited by the statute had run against it.

In view of the acknowledgments and promises to pay the mortgage debt, shown by the proofs, we fail to see that it was barred by the statute of limitations.

The interest in the lot, being undivided, seems to have been of no detriment, as an amicable partition was effected with Griswold, the owner of the other half, without expense.

The outstanding contingent right of dower did not prevent Hughes from obtaining the price he did from Stark.

In the purchase of a mortgage claim under such circumstances, the attorney could not properly ask for so large an abatement from its value, as appears in this case, on account of the condition of the title.

We do not attach much weight to the testimony of Hughes and Glocker as to statements of Zeigler, to the effect that the property was worth from $8000 to $10,000; that Hughes would make $4000 or $5000 by the purchase, and that he was willing to submit to such a sacrifice to raise money and be rid of further trouble. Zeigler denies any recollection of making such statements, and says, that if made, they were not made seriously; that he knew nothing of the value of the property, except what he learned from Hughes; that Hughes and Glocker told him that $1500 would be a good sale. Hughes, in his

letter of July 10, 1862, writes, "that the lot would not bring over $60 per foot," and October 9, 1862, "that he can't offer more than $500 for 12½ feet," which would be at the rate of $40 per foot. It is to be noted, that this was before he had yet found out the defect in the judgment, which, as appears from his letter of November 28, 1862, he had but just then discovered. Our conclusion from the whole testimony is, that there was here a marked inadequacy of price.

We think, too, the proofs in the case disclose a lack of that entire fairness, and perfect good faith, in the informing of Zeigler in regard to the value of the lot, which were required of Hughes in the relation he occupied.

Upon this point, we need but to refer to Hughes' letter of October 9, 1862, wherein he says:

" Under these circumstances, and in view of the prevailing rates here, the most I can offer for 12½ feet more, will be $500, which I may have a chance of paying all cash, if we close soon.

" I have in my hands 50 by 120 feet—a greater depth than your lot, next to the corner of Cass street and Illinois street, some three streets nearer the centre of the city, that my clients would be very glad to sell at that rate, they having had to bid it in for about $2200, eighteen months ago, for a debt due them of some $2500, at a sale under the trust deed securing it.

" Other sales of property in that neighborhood have been made at about that figure, and more, I am satisfied, is offering.

" This morning, a wharf lot, 250 feet on the river, belonging to estate of my former client, John A. Washington, for which he paid $25,000 in June, 1859, was sold under a trust deed securing $10,000 of the purchase money, for $11,000, the highest bid that could be obtained from a number present.

" My offer above is the best I can do in the present state of the property and times, and I am induced simply by a desire to make my 12½ feet suitable for some purpose or other, which it is not now."

This letter was calculated to convey the impression, that the Illinois street lot was more valuable than Zeigler's, on account of its being nearer the centre of the city, whereas that fact at that time made it less valuable. It brought it nearer to the river, and the proof shows, that property on the north side was less valuable the nearer its location to the river.

Several witnesses estimate the value of Illinois street property then, as from three-fourths to one-third less than that of Ontario street property.

The letter conveys the impression, also, that all the wharf lot mentioned in it would bring at a sale was $11,000. The proof shows, that on the twenty-second day of August, 1869, not more than seven weeks before he wrote that letter, Hughes himself sold that river lot for $20,250, agreeing in the contract to make title to the purchaser by a sale under the trust deed then on the premises.

To have enabled Zeigler to form any correct judgment in regard to the value of his own lot, from the facts stated in the letter as to the Illinois street lot, and the wharf lot, Hughes should have commnicated these other facts disclosed by the proof in regard to these lots, and which were within his knowledge. In the absence of these latter facts, the information communicated in regard to these lots, was well calculated to mislead Zeigler, and produce in his mind an under estimate of the value of his own lot.

There was not that fullness of disclosure in this letter, of facts in regard to these lots affecting their value, which the high good faith exacted of Hughes, required him to make.

It is insisted, that the rule relied on should not be applied in this case, because Zeigler had a disinterested professional adviser and assistant in the matter, in the person of Glocker, through whom, as Zeigler's attorney at Baltimore, the whole of the negotiation for the purchase of Zeigler's claim was carried on, and that, therefore, the parties dealt with each other at arm's length, and on an equal footing.

But the following letters between Hughes and Glocker, as well as others, show that Glocker was, to some extent, interested, together with Hughes, in the 12½ feet of the lot, which Hughes claimed as his fee.

Hughes, in his letter of July 10, 1862, to Glocker, says: "Real estate is as flat as ever, and offers poor inducements to invest. The lot would not bring now over sixty dollars per foot, if that. Please inquire of Mr. Zeigler what he will sell me 12½ feet of his remaining three fourths interest, so as to put me in condition to sell out and get my money advanced in the case; get him to make me a low offer. I would not think of buying at all, but for the fact that I have a fourth interest —too small to do anything with. If you could negotiate this purchase from Zeigler, I would try to force my twenty-five feet to sale, and would remit you part of the proceeds, as you desired. My necessities are such that I have lit upon this expedient to relieve them, although I hate to sell any property now."

Glocker, in his letter to Hughes of July 21, writes: "Yours of the tenth instant received. Saw Zeigler; he will take $800 for 12½ feet, which, as I understand, leaves him clear 25 feet by 108; I suppose I am right in the construction of your meaning, that you claim 12½ feet as compensation for our trouble, and then purchase 12½ feet more; so giving you twenty-five feet, leaving twenty-five feet to Zeigler. Zeigler is satisfied with this. Should you raise anything on the twenty-five feet, remit $800 for Zeigler, and, also, my portion of the commission out of the 12½ feet. The balance of twenty-five feet Zeigler thinks he had better hold on to for a while, until real estate brings better prices. I think the above arrangement a very favorable one for us, although real estate is low; still you may get a sufficient price for the twenty-five feet to pay us and get a good commission. Whatever papers you require of Zeigler, draw up; I will see them properly signed."

Letter of October 31, 1862: "Yours of the ninth instant received. Zeigler will let you have 12½ feet for $500, if you

send it to him at an early day. This will leave him, clear, twenty-five feet. I read so much of your letter to him as I thought was necessary to convince him that this was your understanding. Remit as soon as you can, and draw up such papers as are necessary for him and his wife to sign."

So, that it would appear, it was rather for the interest of Glocker, that Hughes should make the purchase from Zeigler, in order that the 12½ feet of the lot, which Glocker was interested in, together with Hughes, might be made available by the addition to it of more ground.

Subsequent letters would indicate, that there was afterwards a different understanding as to Glocker's compensation, and that, at the time of the purchase, he was to be paid otherwise than from the 12½ feet; but the final sale of the lot was at the same price per foot, which Glocker, while he was interested in the 12½ feet, as we infer, had arranged upon with Zeigler for the purchase of another 12½ feet, according to Glocker's letter of October 31, 1862. So that the negotiation about, and the fixing of the price, took place, virtually, while Glocker was interested, as shown in the forepart of the correspondence.

We can well conceive, that after an interest in 12½ feet of this lot had once become fixed in Hughes, he might properly be anxious to add to it more ground, to make it of practical use. But the haste and eagerness manifested to acquire the interest of Zeigler in the lot, in its then incipient state, before the time for redemption from the sale under execution had expired, are not to be regarded with favor.

Instead of stopping short in that stage of the proceedings for realizing the money due on the claim he had for collection, intermitting any further exertions for his client, and bargaining with him for his uncertain and unmarketable interest in the lot, it would have better comported with the relation in which Hughes stood had he continued his efforts in behalf of his client, as well as himself, until he had accomplished the

reduction of the claim into money, and then taken his stipulated share of the avails, in accordance with the terms of his undertaking.

The only causes of action in the bill to which the plea of the statute of limitations of five years is applicable, are those for the proceeds of the sale of the lot to Stark, January 11, 1866; the $1250 received from Griswold, October 21, 1865, and the rent received, which appears to have been subsequent to December, 1863, against neither of which had the five years run. There is no statute of limitations of less than seven years, applicable to a suit for the recovery of the possession of land.

As to *laches,* in not bringing the suit within a reasonable time, the complainant would be allowed a reasonable time after the discovery of the fraud, within which to file his bill to set aside a contract for the sale of land on the ground of fraud.

There is no evidence here when the discovery was made of the inadequacy of the consideration. Zeigler resided in the State of Maryland.

It does not appear, that the bill was not filed within a reasonable time after the discovery of the fraud. Besides, it was held by this court, in *School Trustees* v. *Wright et al.* 12 Ill. 432, that a defendant, to avail himself of such a defense, should set it up in his answer, and so give the complainant an opportunity to amend his bill, by inserting allegations accounting for the delay. This was not done in the present case.

It is insisted, that the bill was rightly dismissed, on the ground of maintenance. The only foundation for this, is the statement of Zeigler, that he was, before the commencement of the suit, approached by an attorney, and inquired of whether he did not want to sue Hughes. He replied, that he did not, as he did not want any further trouble about it, and the attorney then told him, he should have no further trouble about it; that he would take it all upon his own shoulders, and if he would go into it, it would strengthen the other case. He

then, by advice of counsel, refused to answer several interrogatories to get from him the inducements held out, and representations made to him, to allow the use of his name, and Zeigler told Glocker he would not be liable for the expenses.

There is a power of attorney in the case, appointing an attorney to prosecute the suit against Hughes, which mentions it as theretofore instituted at the request and by the authority of Zeigler, dated May 17, 1869.

But all this does not destroy the equity of the complainant's bill, and it should not be dismissed because another person has assumed to defray the expenses of its prosecution.

The transaction under review has redounded largely to the gain of the appellee, and it is one which we think should not receive judicial sanction. The strict hand held over such dealings between attorney and client should not be relaxed.

Sound public policy demands, that there should be no inducements, on the part of any one occupying this important relation, for selfish scheming, to make private gain, out of the subject of his professional employment.

Deeming the inadequacy of consideration, and the want of perfect fairness disclosed in what we have already considered, a sufficient ground for the reversal of this decree, we shall not consider the other questions which have been raised, whether Zeigler knew that Hughes was the real purchaser, and Robert only the nominal one, and whether there was any other misrepresentation as to the value of the land, or exaggeration of the defects in the title.

The appellee should have been decreed to account as trustee for the proceeds of the sale of the lot, and all other receipts in respect to it, after the allowance of his expenditures and stipulated compensation.

The decree is reversed and the cause remanded for further proceedings in conformity with this opinion.

*Decree reversed.*