THE HIBERNIAN BANKING ASSOCIATION

*v.*

THE COMMERCIAL NATIONAL BANK OF CHICAGO *et al.*

*Filed at Ottawa October 11, 1895.*

1. APPEALS AND ERRORS—*error lies from circuit to Supreme Court in suit to remove cloud, where freehold is involved.* A writ of error will lie from the Supreme Court in a suit to remove a cloud upon title, where complainant's claim of the title in fee is put in issue by the pleadings and controverted on the trial, as a freehold is involved.

2. MORTGAGES—*when purchase at foreclosure sale does not give absolute title.* A purchase by a bank of property on foreclosure against its debtor does not give absolute title, so as to cut off an intervening lien, where the bank still holds the amount paid as an indebtedness against the debtor, and as secured by lien acquired by previous deed and by agreement.

3. LIMITATIONS—*construction of section 18 as to departure of debtor from State.* Section 18 of the Limitation act, providing for the deduction of the time of the absence from the State of a debtor departing after the right of action accrues, applies to a suit to foreclose a mortgage, although the mortgage is accompanied with a power of attorney to confess judgment, and jurisdiction is retained to foreclose the mortgage.

4. SAME—*rule that mortgage is incident of debt not changed by section 11.* The rule that a mortgage is a mere incident of the debt, and is barred when the debt is barred,* and not before, is not changed by section 11 of the Limitation law, providing that no person shall commence an action or make a sale to foreclose a mortgage unless within ten years after the right of action or of sale accrues.

5. SAME—*application of section 20 as to action barred in another State.* Section 20 of the Limitation act, barring a debt arising in another State when barred in the latter State, does not apply to a debt accruing in Illinois against a resident thereof who removes to another State after the action accrues.

6. SAME—*effect of death of an absent debtor.* The provision of section 18 of the Limitation act, for deducting from the period of limitation the time of the absence of the debtor from the State, ceases to apply upon his death in another State.

*This rule is not applied in many States of the Union. See the exhaustive note to *Kulp* v. *Kulp*, (Kan.) 21 L. R. A. 550, for a collection of cases, arranged by States.

7. JUDICIAL SALE—*effect of agreement to let wife of owner re-purchase.* A purchaser at a judicial sale does not become a mere mortgagee by reason of giving an agreement to the wife of the previous owner to allow her to re-purchase within a certain time at a certain price, she, by said agreement, releasing all interest in the property in case of her failure to redeem.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

The defendant in error the Commercial National Bank of Chicago filed its bill in equity against the plaintiff in error, the Hibernian Banking Association, in the circuit court of Cook county, to remove as a cloud upon the title to a tract of land in that county a certain warranty deed entered of record, made by one Caulfield to said association. The facts alleged and proved, or admitted by the answer, are substantially as follows:

On April 20, 1875, Bernard G. Caulfield was the owner of the undivided one-half of the land in question, his wife owning the other half, and one William H. Warder claiming to own an equitable interest in it also by virtue of a contract then of record. Caulfield, then owing about $8000 to plaintiff in error for principal and interest upon a promissory note executed in 1872, jointly with one Walker, made and delivered to John V. Clarke, president of the banking association, his warranty deed for said land as security for the payment of said debt. The bill alleges and the answer admits that the deed was a mere mortgage. This deed was not recorded until November 15, 1875. A power of attorney from Caulfield to confess judgment on the note was executed and delivered with the note, in 1872. Before this deed was recorded, and in September, 1875, the Central National Bank recovered judgment by confession against Caulfield for $562.04, upon which execution was issued but no sale made. A short time before the expiration of the lien of the judgment, in September, 1882, the Commercial National Bank bought and had assigned to it the judgment, and thereafter, on

a writ of *venditioni exponas*, the land was sold, and bought by the latter bank October 23, 1882, for $800,—the amount then due on the judgment. Before the purchase of this judgment the Commercial Bank had become a creditor of Caulfield to about $5000, and had also purchased certain tax titles on the land in question.

On March 1, 1883, Bernard G. Caulfield, and Laura, his wife, conveyed all and each of their interests in the land in question, with other tracts, to said Commercial Bank for the expressed consideration of $23,000, and as a part of the transaction the following contract was made between the parties:

"This agreement, made this first day of March, A. D. 1883, between the Commercial National Bank of Chicago, Illinois, party of the first part, and Bernard G. Caulfield and Laura Caulfield, parties of the second part:

"*Witnesseth:* That whereas, the said parties of the second part are indebted to said bank in the aggregate sum of $23,000, bearing interest from the first day of January, A. D. 1883, at six per cent, about one-half of which amount is for taxes advanced for said Laura Caulfield, together with the sum of $500 in cash paid to her by said bank at the date of the execution of this agreement, and the remainder of said sum of $23,000 being a personal debt of the said Bernard G. Caulfield to the said bank; and whereas, for the purpose of securing the payment of said aggregate sum the said parties of the second part conveyed to the said bank, by their deed of this day, all their right, title and interest in and to blocks 1, 3 and 4 in Warder's subdivision of out-lot 32 of the school trustees' subdivision in section 16, in township 38 north, range 14, east of the third principal meridian, in Cook county, Illinois, the undivided two-thirds of which lands are the separate property of the said Laura Caulfield; and whereas, on the 23d day of October, 1882, the said bank purchased the said lands on execution sale against said Bernard G. Caulfield, and holds the sheriff's certifi-

cate of said purchase, on which, after the expiration of fifteen months after the date of said sale, it will be entitled to a sheriff's deed in pursuance thereof if no redemption shall be made, and which is only a sale and purchase of the interest of said Bernard G. Caulfield in said lands:

"Now, it is agreed that as soon as the said period of redemption shall expire on said execution sale, the said bank shall, if no creditor of said Bernard G. Caulfield shall redeem, procure a sheriff's deed of the said interest of Bernard G. Caulfield upon its said certificate, and then a settlement shall be had upon the following basis: To the said sum of $23,000, and interest thereon at six per cent from January 1, 1883, to date of settlement, shall be added any further advances the said bank may make hereafter to protect the title to said property, by payment of taxes and assessments, or otherwise, with interest at six per cent from the date of advance to the date of settlement, and the aggregate shall be paid thus: The lots in said blocks shall each be appraised at their fair cash value by two appraisers, one to be chosen by each of the parties hereto, and if they cannot agree upon cash value, then they shall select a third party, and the appraisal of a majority of the three shall be binding upon the parties hereto. All such appraisers shall live either in the city of Chicago or in the towns of Hyde Park or Lake, and own unincumbered real estate in some portion of said territory, and before making such appraisal such appraisers shall each take an oath to make a true and fair appraisement of said lots according to their best judgment and ability, after going upon such lots and personally examining the same. After the appraisal of said lots in the manner aforesaid, the two said appraisers, if they can agree, if they cannot agree then a majority of the three, are hereby authorized to lay off or assign to the said bank so much of the said lands as may be equal in value to the whole amount due said bank, as aforesaid,

but in doing so they shall divide the land fairly, and in such manner as to protect the rights and interests of all concerned.   If such appraised value of all of said lots shall not equal the amount so due said bank, then the said Bernard G. Caulfield will pay the residue, on demand, to said bank; but if, after the assignment of so many of said lots as shall, at their said appraised value, equal the whole amount due said bank, as aforesaid, there shall remain other lots, all such remaining lots said bank shall forthwith convey, by quit-claim deed, to the said Laura Caulfield, or to such persons as she may direct.   Should the said execution sale be redeemed from, the rights of the parties hereto, as respects each other, shall remain unchanged, but it shall in such contingency become a matter of mutual agreement whether an immediate division of said lots shall be made or further steps taken to perfect the title to said lots before a division, provided, however, an appraisal and division in the manner above set forth will not be delayed beyond the first day of January, 1885.   Should any of the said lots in the meantime, before any appraisal and division, be condemned for any public uses, the moneys that may be awarded shall be received by said bank to apply upon its said debt, provided that said bank shall not accept any sum for damages occasioned by the taking of any of said property for public uses unless the amount thereof shall be satisfactory to the parties of the second part, or unless such damages are ascertained by a jury and competent court.

"Given under our hands and seals this 19th day of March, A. D. 1883.

"Signed in duplicate."

No appraisement was made under this contract as contemplated by it, and there was no setting apart to the bank or conveyance to Laura Caulfield of any of the lots, as mentioned in the contract.   The land not having been redeemed, the Commercial Bank obtained a sheriff's deed

for the undivided interest of Bernard G. Caulfield, on
January 24, 1884. Long prior, and in April, 1874, said
Warder, who claimed an equitable interest in the land
by virtue of his contract aforesaid, filed his bill in equity
against the Caulfields and one Waller to enforce his in-
terests, and afterward, in January, 1887, the Commercial
Bank intervened in Warder's suit, and filed its bill, in
the nature of a supplemental and cross-bill, against the
Caulfields, Warder and others, and afterwards, in Janu-
ary, 1890, obtained a decree that the title was vested in
said bank, subject to the equitable rights of Warder,
with the right of redemption in Laura Caulfield alone.
The decree in that case further found, in pursuance of
the allegations of the cross-bill, that there was then due
to said Commercial Bank from the Caulfields, on the in-
debtedness mentioned in the agreement of March 1, 1883,
and for moneys since advanced, for taxes and otherwise,
to protect the title to the property, with interest thereon,
$27,000, and that Laura Caulfield, in redemption of the
premises under the deed and agreement of March 1, 1883,
should pay the bank that amount and interest in ninety
days. Said Laura did not, however, pay the $27,000, and
under a subsequent order of the court the land was sold
by the master and purchased by the Commercial Bank
June 12, 1890, for $27,873.50. No one redeemed, and the
master conveyed the land to the bank. Before this last
sale, and on December 20, 1887, Bernard G. Caulfield died
intestate in Deadwood, Dakota, where he had resided
from some time in 1878 until his death, the suit having
been revived against his heirs before the final decree.
Warder released to said Laura all of his interest in the
lands in controversy before such decree. Neither the
Hibernian Banking Association nor Clarke was made a
party to that suit.

June 10, 1891, the Commercial Bank and Laura Caul-
field entered into a written agreement respecting said
land, in which it was recited that in a bill lately pending
157—24

in the circuit court, in which William H. Warder was complainant and said Laura Caulfield and others were defendants, and in a bill, in the nature of a supplemental and cross-bill, of the Commercial National Bank, it was decreed that the lands in controversy in that suit (and hereinbefore described) should be sold to pay the amount found due to the bank. It also recited the sale of said premises, under said decree, for the sum of $27,873.50, and that the time for redemption was about to expire, and in consideration of the premises the Commercial National Bank agreed with Laura Caulfield that if she should fail to redeem said lands within the time allowed by law, and in case the bank should become possessed of the title to said lands, in fee simple, by virtue of said decree and master's sale, the bank would, after it became the owner of the title, sell and convey such lands to said Laura Caulfield, subject to any adverse claim to or lien upon them, upon the payment to it, within one calendar month thereafter, of the following sums: $35,000 and interest thereon at eight per cent from June 12, 1891, all moneys that the bank might pay out for taxes, assessments and other charges, and also other items therein specifically set forth,—and time was made of the essence of said contract; and on the failure of Laura Caulfield to make payments as therein provided, that said contract should no longer be binding, but should be null and void. In such case, however, the bank would manage, hold, and from time to time, as it might have opportunity and be reasonably able, sell and dispose of the property at its own judgment and discretion, and upon such terms and conditions and for such prices as to it might seem proper, and deduct and reserve to itself all of the proceeds of such sales necessary to pay the various sums before recited, with eight per cent interest, and if any surplus remained in its hands after paying the said sums therein provided, that it would pay and deliver the remainder and surplus to said Laura Caulfield. In consideration

thereof said Laura Caulfield released and quit-claimed all right, title and interest which she had in and to said lands, save as she had acquired them by said agreement, which it was agreed was a right to re-purchase only, and that the agreement did not continue any interest in her whatever, but that her failure to redeem was to be an absolute abandonment and forfeiture of all her right, title and interest in said land, of every nature and kind.

The master reported the evidence and his conclusions to the court, recommending that a decree be entered dismissing the bill for want of equity, but the trial court entered a decree sustaining complainant's bill and decreed the relief prayed. The Hibernian Banking Association sued out this writ of error to reverse that decree. It also appealed to the Appellate Court, where the appeal was dismissed for want of jurisdiction, on the ground that a freehold was involved.

WILSON, MOORE & McILVAINE, for plaintiff in error:

The Statute of Limitations did not run in the absence of Caulfield, notwithstanding the power of attorney to confess judgment. Starr & Curtis' Stat. chap. 83, secs. 11, 18, 20; *Green* v. *Capps*, 142 Ill. 286; *Bedell* v. *Janney*, 4 Gilm. 193; *Bassett* v. *Bassett*, 55 Barb. 505; *Rockwood* v. *Whiting*, 118 Mass. 337; Angell on Limitations, (6th ed.) secs. 485-487, 194; Wood on Limitations, sec. 252; *Sacia* v. *De-Graaf*, 1 Cow. 356; *McIver* v. *Ragan*, 2 Wheat. 25; *Amy* v. *Watertown*, 130 U. S. 320; "*The Sam Slick*," 2 Curtis, 480; *Bank* v. *Dalton*, 9 How. 522; *Parker* v. *Kelly*, 61 Wis. 552; *United States* v. *Maillard*, 4 Bened. 465; *Wilson* v. *Appleton*, 17 Mass. 179; *Stevenson* v. *Westfall*, 18 Ill. 209; *Pryor* v. *Reyburn*, 16 Ark. 671; *Wells* v. *Child*, 12 Allen, 333; *Favorite* v. *Booher's Admr.* 17 Ohio St. 554; *Warfield* v. *Fox*, 53 Pa. St. 382; *Jones* v. *Lemon*, 26 W. Va. 629; *Rowell* v. *Patterson*, 76 Me. 196; *Fairbanks* v. *Long*, 91 Mo. 628; *Dozier* v. *Ellis*, 28 Miss. 730; *Demarest* v. *Wynkoop*, 3 Johns. Ch. 142; *Lawrence*

v. *Bridleman*, 3 Yerg. 501; *Heaton* v. *Fryberger*, 38 Iowa, 185; *Hazell* v. *Shelby*, 11 Ill. 9.

The plaintiff in error is not barred by *laches.*   *School Trustees* v. *Wright*, 12 Ill. 432; *Zeigler* v. *Hughes*, 55 id. 288; *Gibbons* v. *Hoag*, 95 id. 45; *Kane County* v. *Herrington*, 50 id. 232; *Locke* v. *Caldwell*, 91 id. 417; 12 Am. & Eng. Ency. of Law, p. 533; Wood on Limitations, sec. 62; *Canal Co.* v. *King*, 2 Sim. 89.

The claim of plaintiff in error was not cut off by the sale under the Central National Bank judgment.   *Karr* v. *Peacock*, 137 Ill. 367; *Hoag* v. *Starr*, 69 id. 365; *Harbison* v. *Houghton*, 41 id. 522; *Insurance Co.* v. *Kirchoff*, 133 id. 368; *Pensoneau* v. *Pulliam*, 47 id. 58.

The claim of the Hibernian Bank is not barred by failure to sue in Dakota.   *Wooley* v. *Yarnell*, 142 Ill. 442; *Bissell* v. *Marine Co.* 55 id. 168; Story's Eq. Pl. sec. 175.

J. A. SLEEPER, for defendant in error:

Courts of equity will not apply the technical doctrine of merger when the intention or the just interests of the parties require that a merger should not take place. *Fowler* v. *Fay*, 62 Ill. 375; *Bank* v. *Cheeney*, 87 id. 602; *Flower* v. *Elwood*, 66 id. 438; *Smith* v. *Roberts*, 91 N. Y. 470; *Sheldon* v. *Edwards*, 35 id. 279; *Andrus* v. *Vreeland*, 29 N. J. Eq. 394; *Edgerton* v. *Young*, 43 Ill. 464; *Dunphy* v. *Riddle*, 86 id. 22; *Insurance Co.* v. *Corn*, 89 id. 170.

The deed from Caulfield to Clarke was absolute on its face.   By it the title passed to Clarke, and therefore the sale by the sheriff was not a sale of Caulfield's land, but of Clarke's land.   *Morton* v. *Noble*, 57 Ill. 176; *Stowe* v. *Steele*, 114 id. 382.

The judgment was subject to the mortgage created by the note of Caulfield and Walker and the deed to Clarke, even though the statute had not run in Caulfield's favor, because of his residence out of the State.   *Wood* v. *Goodfellow*, 43 Cal. 185; *Watt* v. *Wright*, 66 id. 202; *Wormouth* v.

*Hatch,* 33 id. 121; *McCarthy* v. *White,* 21 id. 495; *Heinlin* v. *Castro,* 22 id. 100; *Lord* v. *Morris,* 18 id. 482.

Conceding that during Caulfield's absence from the State the Statute of Limitations did not run against an action on that note, still, when Caulfield died in Dakota, by no possibility could any action be maintained against him on that note, and could only be maintained against his administrator, and as Caulfield's death terminated his absence from the State of Illinois, the Statute of Limitations of this State began again to run against that debt in this State.     *Christophers* v. *Garr,* 6 N. Y. 61; *Davis* v. *Garr,* id. 124.

A party can not claim aid who has been guilty of *laches* in protecting his rights, unless such *laches* may be imputable to the party claiming against him.     It is also a rule that every particular case stands upon its own particular circumstances.     *Dickerman* v. *Berry,* 20 Ill. 267; *Walker* v. *Carrington,* 74 id. 448; *Munn* v. *Burges,* 70 id. 604; *Carpenter* v. *Carpenter,* id. 457; *Howe* v. *South Park Comrs.* 119 id. 110.

This doctrine of *laches* is applied where the period is less than that fixed by the Statute of Limitations, on the ground of discouraging stale claims or unexplained acquiescence in the assertion of an adverse right.     Story's Eq. Jur. 1521; Bishop on Modern Eq. Jur. secs. 17, 18, 20; *Castner* v. *Walrod,* 83 Ill. 174.

Mr. JUSTICE CARTER delivered the opinion of the court:

In *Hibernian Banking Ass.* v. *Commercial Nat. Bank,* (*infra,* p. 576,) on appeal from the Appellate Court, we held that a freehold was involved in this controversy, and affirmed the judgment of that court dismissing the appeal thereto taken.     It is unnecessary to repeat the reasons here for that decision, but the conclusion is, that the writ of error was properly issued to bring the record of the circuit court directly to this court for review, on the ground that, the complainant's claim of the title in fee being put in

issue by the pleadings and controverted on the trial, a freehold is involved in the case.

If the Commercial National Bank became the owner in fee of the lands in question by the sheriff's deed of January 24, 1884, the lien of the Hibernian Banking Association created by Caulfield's deed to Clarke, absolute in form but in fact given as a mere security for a debt due the banking association, was cut off, and became a cloud on the title of the Commercial Bank. If, however, as insisted by plaintiff in error, the sheriff's deed, taken in connection with the agreement between the Caulfields and the Commercial Bank and the deed of the Caulfields to said bank of March 1, 1883, must be construed to be a mortgage, then it is plain that the lien of plaintiff in error created by the deed to Clarke was not lost and the title of defendant in error was not clouded thereby.

It appears to us very clear that the Commercial Bank did not obtain absolute title to the property by the sheriff's deed. On March 1, 1883, about five months after the sheriff's sale and about ten months before obtaining the sheriff's deed, the Commercial Bank took from the Caulfields a deed for the property, and at the same time entered into an agreement reciting that the grantors owed the grantee $23,000, with interest at six per cent, to be computed from January 1, 1883, and had by said deed conveyed the property, one-third of which belonged to Mr. Caulfield and two-thirds to Mrs. Caulfield, to the bank to secure said indebtedness. The agreement also recited the sheriff's sale of October 23, 1882, of Caulfield's interest in the property, and that if no redemption should be made within fifteen months the bank would be entitled to a sheriff's deed. It then provided that the bank should procure the sheriff's deed, and a settlement should be made by allowing the bank the $23,000 and interest, and all advances made to protect the title, with interest thereon, and the aggregate should be paid by having the lots into which the property was divided, appraised, the

appraisers to be appointed by the parties, and a sufficient number of such lots set off to the bank, at their appraised value, to pay its debt, and the remaining lots should be conveyed to Mrs. Caulfield, or to such person as she should direct. If the lots, at their appraised value, should not be sufficient to pay the debt, then Caulfield was to pay the deficiency. It was proved that the amount paid by the bank for the property at the sheriff's sale entered into and formed a part of the indebtedness of $23,000 mentioned in the agreement. No appraisement of the lots or conveyance of any of them to Mrs. Caulfield was ever made. While it appears that the Commercial Bank took possession after obtaining the sheriff's deed, paid taxes and purchased tax titles, the effect of the evidence is that it never treated its title as adverse to Caulfield. On the contrary, by its accounts and by its intervention in the Warder suit, where, by cross-bill, it sought to foreclose its lien on the property as against the Caulfields, and to have the amount of its debt as it then stood adjudicated and the property sold to pay it, and by its purchase of the property at the master's sale under the decree in the Warder suit, which decree preserved the equity of redemption of Mrs. Caulfield in the whole property, the bank, in effect, treated its various titles as mere security for its demands, and in nowise as an absolute title in fee hostile to Caulfield. The fact that the equity of redemption was preserved to Mrs. Caulfield, and not to Mr. Caulfield, did not change the effect of the instruments from that of a mortgage to that of a title in fee simple. They still constituted a mere lien to secure the indebtedness specified. The bank could not treat the sheriff's deed as a complete divestiture of Caulfield's title, and still hold against him, as an indebtedness, the amount it had paid for his interest at the sheriff's sale, with interest thereon, and as being secured by its lien on the land acquired by the deed and agreement of March 1, 1883.

We are inclined to agree with the conclusions of the master in his report to the court below, that the legal effect of these transactions was, that the Commercial Bank redeemed the interest of Caulfield in said lands from the sheriff's sale, for him, and charged against him the moneys paid in making such redemption, and that the certificate and sheriff's deed became merged in the general claim of the bank, and, together with the agreement and deed of March 1, 1883, constituted its lien on the property to secure the re-payment of its debt. We cannot see how the money paid by the Commercial Bank for Caulfield's interest at the sheriff's sale could be treated, as the same was treated, as an indebtedness of his to the bank, without treating it as money advanced by the bank for him to redeem from the judgment sale. Had the Caulfields paid the whole demand of the bank after the bank received the sheriff's deed, without carrying out the provisions respecting the appraisement and division of the property, (and that provision never was carried out,) such payment would have amounted to a redemption of the whole property, and equity would have compelled a restoration of the title as it stood before the sale. It may be that for *laches* of the banking association, or other equitable causes, the lien of the plaintiff in error, under its deed to Clarke, became postponed to that of the Commercial National Bank; but we are of the opinion that it was not cut off by the sheriff's deed operating as vesting title in fee simple absolute in said bank.

It is also contended by defendant in error that plaintiff in error has lost its mortgage lien by reason of its failure to foreclose the same within ten years after the right of action accrued under the 11th section of the Limitation act, which provides that "no person shall commence an action or make a sale to foreclose any mortgage, or deed of trust in the nature of a mortgage, unless within ten years after the right of action or right to

make such sale accrues." And it is said that inasmuch as Caulfield's interest in the land had passed to defendant in error, (if not by the sheriff's deed, then by the master's sale and deed under the decree in the Warder suit,) and inasmuch as plaintiff in error had from Caulfield a power of attorney to confess judgment, and inasmuch as the court retained jurisdiction to foreclose the mortgage of plaintiff in error notwithstanding Caulfield's departure from the State, no reason remains why the exception contained in section 18 should apply or the time of his absence from the State be deducted; and that plaintiff in error, having commenced no action to foreclose or enforce its lien within ten years after the right to do so accrued, when it might have done so at any time, is now barred from such right by said 11th section, and that it has become immaterial to inquire whether the indebtedness was barred or not.

We have seen that by the agreement and deed of March 1, 1883, those instruments and the sheriff's deed became, in the hands of defendant in error, a mere mortgage, and while it was adjudged in the Warder suit, when the decree was rendered, in 1890, that Caulfield's title had vested in defendant in error under the sheriff's deed, such decree could not affect the lien of plaintiff in error, it not being a party to the suit. But aside from this line of argument, it has been repeatedly decided by this court that the mortgage is a mere incident of the debt, and is barred when the debt is barred, and not before, and that the rule remains the same since the enactment of section 11. (*Schifferstein* v. *Allison*, 123 Ill. 662; *VonCampe* v. *City of Chicago*, 140 id. 361, and cases there cited.) It follows, therefore, that if Caulfield's indebtedness to plaintiff in error, secured by the mortgage, was not barred, the mortgage was not barred. While it may be true that the reason for the exception created by section 18 of the statute does not exist in full force when applied to this case, inasmuch as the absence of Caulfield

from the State did not prevent foreclosure of the mortgage or the obtaining of a personal judgment against him, by confession, prior to his death, still, as the case comes within the express language of the exception, we cannot assume the province of the legislature and say that the exception ought not to apply, and that although having departed from the State after the cause of action accrued, and residing in another State, he, having substituted certain supposed equivalents for his presence in this State, should be treated as present, within the meaning of the statute. *Bedell* v. *Janney*, 4 Gilm. 193; *Hazell* v. *Shelby*, 11 Ill. 9; *Stevenson* v. *Westfall*, 18 id. 209; *Pells* v. *Snell*, 130 id. 379; *Bassett* v. *Bassett*, 55 Barb. 505; *Rockwood* v. *Whiting*, 118 Mass. 337; Angell on Limitations, (6th ed.) secs. 485-487, 194; Wood on Limitations, sec. 252; *Sacia* v. *DeGraaf*, 1 Cow. 356; *McIver* v. *Ragan*, 2 Wheat. 25; *Amy* v. *Watertown*, 130 U. S. 320; *Parker* v. *Kelly*, 61 Wis. 552; *Pryor* v. *Reyburn*, 16 Ark. 671; *Rowell* v. *Patterson*, 76 Me. 196; *Fairbanks* v. *Long*, 91 Mo. 628; *Dozier* v. *Ellis*, 28 Miss. 730.

The principle contended for by defendant in error does not come within the doctrine that an exception may be engrafted upon the statute by what is called invincible necessity,—such, for instance, as civil war. It is, however, contended, that the debt was barred under the statutes of Dakota, which provided, first, that actions in such cases must be brought within six years; second, that in case of the death of the debtor before the expiration of the time limited, actions might be brought against the administrator within one year after his appointment, and not thereafter; and third, that administration was had and closed in Dakota on the estate of Caulfield, and the claim of plaintiff in error was not presented or allowed within the time limited, and that by the statutes of that then territory all claims not so presented and allowed within the time so limited were forever barred; and it is said that the debt, being so barred in Dakota, is, by virtue

of the 20th section of our Limitation act, barred here. We cannot regard either position relied upon as tenable. This suit was begun in March, 1892, and it is undisputed that Caulfield removed to and became a permanent resident of Dakota in October, 1878, and died there in December, 1887. Interest was paid on the note which the mortgage was given to secure, to July 30, 1874, and neither the debt nor the right to foreclose would, under the 11th or 16th sections of our statute, be barred until ten years after such payment of interest. But after the cause of action accrued in this State, Caulfield departed from this State and took up his residence in Dakota, and by section 18, and the construction given to it in *Wooley* v. *Yarnell*, 142 Ill. 442, the time of his absence cannot be counted as any part of the time limited for the commencement of the action, and section 20 does not apply for the reason that the cause of action accrued in this State before his departure, and it could not be said to have arisen in Dakota. The six year statute of Dakota therefore had no application. Deducting the period of his absence, ten years had not elapsed when the suit was begun, and the bar of the statute of this State had not become complete.

It is said, however, that when Caulfield died his absence terminated, and that a cause of action then arose in Dakota against his administrator, and no action having been there commenced or claim filed against his estate, by virtue of the statute of Dakota the debt was barred there, and under said 20th section is barred here. It is true that only his absence up to the time of his death can be deducted, for when he died the section of the statute providing for deducting such absence ceased to apply, except as to the time of such absence preceding his death, and the time began to run again under the ten year section, as before his departure from the State, unless prevented by the 19th section of our statute, as contended by plaintiff in error. His death did not prevent the running of the statute, unless the

statute itself so provided. (*Bonney* v. *Stoughton*, 122 Ill. 536). The 19th section is as follows: "If a person against whom an action may be brought die before the expiration of the time limited for the commencement thereof, and the cause of action survives, an action may be commenced against his executors or administrators after the expiration of that time, and within one year after the issuing of letters testamentary or of administration."

It is urged by counsel for plaintiff in error that the statute did not commence to run again at all after the death of Caulfield. They say: "As no administration has been taken out in this State, the running of the statute never began after the death of Caulfield. The foreign administration is immaterial on this point. Our statute relates to administration in this State, and this only would be equivalent to the return of the non-resident or his representative.—See *Gallup* v. *Gallup*, 11 Metc. 445." Whether counsel are correct in this contention, or whether it is a sufficient answer to it to invoke the familiar rule that one disability cannot be tacked to another to prevent the running of the statute, it is not necessary here to decide, for, as before said, if it be conceded that the statute began to run again at Caulfield's death, the ten year bar did not become complete. Nor can it be said that because of his death any cause of action arose against his administrators which did not before exist against him. One provision of the Dakota statute was, that in case of death before the bar had become complete a year should be allowed in which to bring suit after the administrator was appointed. This was a mere enlargement of the time limited by other provisions because of the death of the debtor. But in this case the six years allowed by the Dakota statute in which to bring suit had expired before his death, and it could not be said that a cause of action arose on his death against his administrator when the same cause of action was barred against him before his death. The question is not simply

whether or not the debt was barred by the laws of Dakota, but also whether or not the cause of action arose in Dakota. Under the construction given to the statute in *Wooley* v. *Yarnell, supra,* it is plain that the cause of action did not arise in Dakota, but in Illinois. In that case it was said that the doctrine was the same as announced in *Hyman* v. *Bayne,* 83 Ill. 256, and *Hyman* v. *McVeight,* (unreported, but mentioned in 87 Ill. 708,) and that what was said in the latter case "must be limited and confined to the facts presented by the record then before the court,—that neither the maker nor the payee of the note, at the time the cause of action arose, resided in Illinois."

No sufficient showing is made by the bill or proof to establish title in defendant in error by virtue of the certain tax sales and deeds mentioned in the record, and we do not understand counsel to contend very seriously that complainant's title is so derived, or that it held possession or paid taxes under such title as color of title made in good faith for seven successive years. As we understand the record, the disbursements for these tax titles were charged up against the Caulfields as a part of their indebtedness to defendant in error, one of its witnesses testifying that these disbursements were included in the $23,000 mentioned in the agreement of March 1, 1883. And it will also be noticed that under that agreement all disbursements for taxes, with interest thereon, were to be added to the $23,000. None of these moneys having been repaid, as contemplated by the agreement, they were carried forward and set up as a charge against the Caulfields and the property in the Warder suit, and the property was, under the decree in that case, sold to reimburse defendant in error for all of its outlays. No argument is needed to show that such payment of taxes for seven successive years could not, under the statute, coupled with the possession and title held by defendant in error, ripen into an independent title.

Counsel have at some length discussed the question of *laches*, and it is insisted on the part of defendant in error that even if the mortgage lien is not barred by the Statute of Limitations, it is barred by the *laches* of plaintiff in error. Whether or not, under proper allegations of the bill, the doctrine of *laches* could be invoked as applicable to such a state of facts shown by the proof, we shall not consider, for there is no allegation in the bill under which any such relief could be granted, even if otherwise proper. *Zeigler* v. *Hughes*, 55 Ill. 288.

When the defendant in error received the master's deed to the land in controversy under the decree and sale in the Warder suit, it became the owner of the title to the property, and the contract of June 10, 1891, whereby Mrs. Caulfield was given the right to re-purchase within a certain time at a certain price, did not convert the master's deed into a mortgage. There was no indebtedness of Mrs. Caulfield to be secured by any such mortgage, and by the contract she expressly released and quitclaimed to the bank, in case of her failure to redeem under the decree, any and all interest which she might have in the property, and it was expressly provided that the contract should not continue any such interest in her, but all such interest should be forever forfeited and abandoned, and that she did not take or acquire any interest in the land by the contract except the right to re-purchase. We cannot, upon the face of these papers, hold that by this contract and deed the bank became the mere mortgagee of this land. We are of the opinion that defendant in error showed sufficient title in itself to sustain the bill, had it been able to support its allegations respecting the mortgage lien of plaintiff in error. Failing, however, in the latter respect, it was not entitled to the decree which it secured.

The decree of the circuit court will be reversed and the cause remanded.             *Reversed and remanded.*